**Ericka Shanette COLBERT, Appellant,**

v.

**DEPARTMENT OF FAMILY & PROTECTIVE SERVICES, Appellee.**

Nos. 01–04–01232–CV, 01–04–01233–CV, 01–05–00124–CV, 01–05–00126–CV, 01–05–00127–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 21, 2006.

Opinion Dissenting from Denial of En Banc Reconsideration July 2, 2007.

---

Lisa Rice Hulsey, Asst. Co. Atty., Sandra D. Hachem, Sr. Asst. Co. Atty., Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

SAM NUCHIA, Justice.

Appellant, Ericka Shanette Colbert, appeals five orders terminating her parental rights to her seven children, T.J.C. and T.D.C. (the twins), and D.N.C., T.L.J., T.B.J., E.D.C., and J.D.M (the five older children).[1] In three issues, appellant challenges (1) the legal and factual sufficiency of the evidence to support the trial court's finding that she knowingly placed or allowed the twins to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) the legal sufficiency of the evidence to support the finding that the termination of parental rights was in the best interest of the twins, and (3) the factual sufficiency of the evidence to support the findings that the termination of parental rights was in the best interest of all the children. We reverse the order relating to the twins and render judgment in appellant's favor. We reverse the orders relating to the five older children and remand those cases to the trial court.

## Background Facts

In April 2003, appellant was living in a three-bedroom house with her five children, ten-year-old D.N.C., eight-year-old J.D.M.,[2] six-year-old E.D.C., five-year-old

Reo Harris Jr., Spring, TX, William B. Connolly, William B. Connolly & Associates, Houston, TX, for Appellant.

1. D.N.C. is the subject of appeal number 01–04–01232–CV, trial cause number 1996–43960; T.L.J. and T.B.J. are the subjects of appeal number 01–04–01233–CV, trial cause number 2002–25084; T.J.C. and T.D.C. are the subjects of appeal number 01–05–00124–CV, trial cause number 2004–03601J; E.D.C. is the subject of appeal number 01–05–00126–CV, trial cause number 2003–04414J; and J.D.M. is the subject of appeal number 01–05–00127–CV, trial cause number 2003–14864.

2. J.D.M. actually lived more with his paternal grandfather than with appellant. However, he was with appellant at the time of this occurrence.

T.L.J., and three-year-old T.B.J. The children's maternal grandmother, JoAnn Colbert (the grandmother), and the grandmother's boyfriend, Kenneth Newman, also lived in the home. In early April, Trenton Jackson, the father of T.L.J. and T.B.J., moved into the household. On or about April 3, Jackson brought T.J., his three-year-old daughter by another woman, into the home to visit. On April 4, Jackson "spanked" or "whipped" T.J. with a leather belt for wetting her pants. On April 5, Jackson again "whipped" T.J., this time for defecating in her pants. In the early evening of April 5, T.J. was found unconscious, and someone called 9–1–1. T.J. was taken to the hospital by ambulance, and Jackson was arrested and charged with injury to a child. T.J. died on April 9, and an autopsy showed that the cause of death was a blunt-force head injury. In April 2004, Jackson was found guilty of injury to a child and was sentenced to life in prison.

In May 2003, the Department of Protective and Regulatory Services, the predecessor of the Department of Family and Protective Services ("DFPS"), took possession of appellant's five children and filed a petition for protection of a child, for conservatorship, and for termination of appellant's parental rights with respect to each of her five children.[3] The petition also sought termination of the parental rights of each of the children's fathers.[4] As grounds for the termination of appellant's rights, the petition recited subsections (1)(A)-(G) and (J)-(S) and (2) of section 161.001 of the Family Code.[5] DFPS did not remove the children from the home at that time.[6]

Jackson was out of jail on bond while he awaited his trial, and DFPS had told appellant not to allow Jackson to be around the children. However, appellant did not believe that Jackson's actions had caused T.J.'s death, and she let Jackson move back into the house. DFPS later learned that Jackson was living in the house and removed the children from appellant. DFPS placed J.D.M with his paternal grandfather and the other children with the grandmother, who, along with Newman, still lived in appellant's house. Appellant moved out of the house, stayed with a cousin, and visited her children during the day.

**3.** The Department of Protective and Regulatory Services was renamed the Department of Family and Protective Services effective February 1, 2004. 29 Tex. Reg. 3659 (2004) (notice of agency name change); Act of June 2, 2003, ch. 198, §§ 1.01(c), 1.18, 1.23, 1.26, 2003 Tex. Gen. Laws 611, 611, 623, 635, 640, 641, 642 (name change effective on date specified in transition plan required by section 1.23 of act).

**4.** The fathers of D.N.C. and J.D.M. were in prison, and the whereabouts of E.D.C.'s father were unknown.

**5.** *See* Tex. Fam.Code Ann. § 161.001(1)(A)-(G), (J)-(S), (2) (Vernon 2002 & Supp.2006).

**6.** Appellant had a history with DFPS. In 1998, after being evicted from her apartment for non-payment of rent, appellant, her cousin, and their children were staying in a motel room with only one bed. Appellant, her two-week-old infant, and a couple of older children were sleeping in the bed one night. When appellant woke up, the infant was not breathing and blood was coming from his mouth. Appellant took the infant to a fire station nearby, but he could not be resuscitated. The autopsy report showed the cause of death as asphyxia, but the manner of death was undetermined. DFPS investigated, but found no indication that appellant was at fault. After this incident, DFPS provided services to appellant, including parenting classes, which she completed. In four other referrals to DFPS, allegations of abuse or neglect were resolved as "Ruled out" or, in one instance, as "Unable to Determine/Factors controlled."

After DFPS took custody of the children, The Children's Crisis Care Center (the CCCC) did a family evaluation, during which appellant revealed that the grandmother had a history that included drug convictions, that she was currently on parole, and that she no longer used drugs and had made a better life for herself. DFPS learned that the grandmother also had convictions for prostitution and burglary, and that Newman had convictions for aggravated robbery, breaking and entering, and possession of cocaine. In December 2003, DFPS took possession of the four children and put them in substitute care. J.D.M. remained with his grandfather. At the time of trial, the two boys were in the same foster home and the two girls were each in different foster homes.

DFPS offered various services to appellant and her family as a part of DFPS's permanency planning. Appellant participated in therapy, parenting classes, and anger management classes and was allowed supervised visits with the children for one hour every two weeks. Appellant attended all the family visits allowed by DFPS and made all her court appearances.

On January 30, 2004, appellant gave birth to T.D.C. and T.J.C., whose father was Jackson. In April 2004, DFPS removed the two-and-one-half-month-old twins from appellant's home. DFPS filed a petition for protection, conservatorship, and termination of parental rights with respect to the twins. The five cases, which included all seven children, were tried together in November 2004.

### The Evidence

#### 1. Appellant

At her trial in November 2004, appellant testified that she saw Jackson spank T.J. only one time—with a belt on April 5.[7] Appellant further testified that she bathed T.J. after the spanking and told Jackson that there were better ways to discipline a child. Appellant said that, after bathing T.J., she left the house and returned one and one-half to two hours later. Appellant testified that when she returned home, the ambulance had gone and Jackson was sitting in a police car.

#### 2. The Therapist

Brenda Hornaday, the therapist who treated four of the five older children beginning in about August 2003, testified that she visited with the children in appellant's home weekly and that her primary focus with the children was behavior modification. She said that the house was orderly, but that there was chaos. She testified that there were a lot of people in the house and that children were always present. She said that the grandmother allowed her to conduct the therapy in the grandmother's bedroom. Hornaday testified that, based on her visits, she could not assess whether the home environment was conducive to the children's return. She said that she had no opinion regarding the termination of appellant's parental rights. She thought that the children would be able to deal with never going back to their mother. She said that the children needed consistency, stability, structure, and patience and were getting some of those things at home, but that they need all of those things.

Hornaday testified that all the children were very much bonded with their mother and that they loved Jackson. She said that two of the children told her that they got "whippings," but did not say by whom,

---

7. At Jackson's trial in April 2004, appellant testified that she saw Jackson spank T.J. two times: once on April 4 and once on April 5, 2003. At the termination trial, appellant said that she knew about the April 4 spanking because Jackson told her.

and she did not ask. She was not able to address the severity of the whippings, because the children did not talk about that. She testified that the children would need continuing therapy, and that, if they were returned to their mother, Hornaday would continue to treat them. She also stated that, if stability, consistency, patience, and structure could prevail in the chaos in appellant's home, it would be in the best interest of the children to return them to their mother. If not, returning them would not be in their best interest. She stated that she did not have sufficient information on appellant to assess whether appellant could develop the needed attributes. She knew that family visitations were scheduled every two weeks, but she had never observed one. In response to a hypothetical situation in which a mother had one hour to visit with all her children, she responded that it was possible that one child might feel neglected.

### 3. The Grandfather

Kenneth Williamson, J.D.M.'s paternal grandfather, testified that J.D.M. had been living with him for about a year and had previously lived with him from the ages of five months to eight or nine years. He testified that J.D.M. lived with him because Williamson did not like the atmosphere at appellant's home, with its "[i]n and out traffic," which he suspected was drug trafficking, although he could not be sure. He said that appellant visited J.D.M. "two, three, four times at the most" and that J.D.M. spent some weekends with appellant. He testified that J.D.M. saw appellant as a mother figure and that the two had a close bond. He opined that appellant loved all her children, but made bad choices. He said he would not have concerns if J.D.M. went back to appellant's home, but would have concerns if the home had the same environment as before. He had attended the family visits and thought

that appellant treated all the children the same.

### 4. The Guardian Ad Litem

David Cooney, the children's guardian ad litem through Child Advocates, had been involved in the case since August 2003. He testified that he visited the home before the children were removed and had concerns about the presence of Kenneth Newman, the grandmother's boyfriend, in the home because of his criminal record. Cooney also testified that he had concerns about the grandmother's extensive criminal history. He further testified that, in December 2003, he recommended to the court that the children be removed from the home because of his concerns about appellant's minimizing Jackson's role in the death of T.J. and appellant's failure to acknowledge her own responsibility to protect T.J. or to admit the severity of T.J.'s bruises. However, he testified that, if appellant had recognized that Jackson was responsible for T.J.'s death, he would not have changed his mind about termination.

Cooney felt that the 28 months of services appellant received after the death of her infant son in 1998 had been ineffective because she had another child after those services had been completed. However, he denied holding the birth of that child against her, but explained that he saw a pattern in her life of choosing men who wound up in prison. He testified that the initial goal of Child Advocates in this case, like that of DFPS, was family reunification, but that goal was changed in December 2003 to reunification/adoption when they discovered that Newman was still living in the house. However, Cooney could not recall telling appellant that Newman should move out, and the record does not reveal how or when appellant was told that Newman could not live in the home.

Cooney testified that, during the family visits, which were customarily one hour long, appellant gave most of her time to the twins; the other five did not get equal time and would play with each other, sit by themselves, or play games. He stated that he thought that appellant could ask for more time and that she did ask for and receive an extra hour to visit T.L.J. when he was in the hospital. He said he thought that the children love appellant, but that they don't show affection as he thinks children would. He also stated that he did not know whether it is normal for a mother to spend more time with babies than with older children.

Cooney testified that, when he visited the children in appellant's home, they were exuberant and hard to settle down. In his opinion, appellant could not give the structure that they needed, and he had not seen that she had the will to change. He further testified that, since their placement in substitute care, the children's school work had improved and that he believed termination of appellant's parental rights was in the best interest of the children.

### 5. The Caseworker

Adrienne Aiken, the DFPS caseworker, testified that the goal for services changed from reunification to adoption first with the twins in the spring of 2004 shortly after they were removed from appellant's home on April 15. The decision was formally made at a meeting of the Permanency Planning Team (PPT) in May. She further testified that the goal for all the children changed to adoption in June based on incidents over the period of Jackson's trial and appellant's minimization of both Jackson's and appellant's roles in the death of T.J.[8] Aiken testified that com-

ments appellant made in the spring of 2003 to DFPS were contradictory to statements she made during Jackson's criminal trial in April 2004. Aiken stated that she had not seen a great deal of progress in appellant's recognizing her role in what happened to T.J. Aiken stated that she believed that there was "overwhelming evidence" to show that T.J. was abused in appellant's presence and that appellant failed to be protective. She said that appellant's belief that Jackson was not responsible for T.J.'s death affected appellant's parenting skills because it affected her ability to be protective of her children. However, Aiken also testified that if, just before the twins were removed, appellant had conceded that Jackson had killed T.J., Aiken would still recommend termination of appellant's parental rights.

Aiken testified that appellant's rights should be terminated because Aiken believed that all the children had been abused and neglected-physically abused and neglected and emotionally neglected. She stated that she could see the results of that abuse and neglect in the children's behavior, such as the way they socialize and respond to people and the language they use, telling teachers to "Kiss my butt" and using "more graphic language." As a further example, she said that T.L.J. was hospitalized for threatening to kill a child at school. But she also testified that when someone talked to T.L.J. about the threat, he did not know that "killing" meant what had happened to T.J., and, according to Aiken, he was "horrified" that he had said that to someone.

Aiken also testified that she had been at all of appellant's family visits with the children and observed that there was not a

---

**8.** Appellant's "role" in T.J.'s death, according to Aiken, was her failure to protect T.J. from Jackson.

"big bond" with the children and not a "lot of nurturing" by appellant. Aiken stated that, when she asked appellant to give special attention to E.D.C., appellant did not do so. The twins got almost all the attention. She testified that she believed that termination of appellant's rights was in the best interest of the children because she believed that the children deserved an opportunity for permanency, stability, and consistency in their lives. She also stated that she believed the children were adoptable. She said that she was not disputing that appellant had completed the services offered to her.

Aiken testified that, although appellant had made all the family visits and court appearances, she had not done everything she was asked to do. According to Aiken, appellant had not obtained appropriate housing, and Aiken had not seen proof that appellant had a job and was making the wages she claimed. Aiken said that the problem with the house appellant was currently living in was that T.J.'s death had occurred there and the children should not be living in that house. When asked whether Aiken had told appellant that, if appellant got other housing, it would change Aiken's opinion about termination, Aiken responded, "When the plan was given to Miss Colbert that she signed, it was—that's what it said."

The attorney ad litem for the children asked Aiken how he could guarantee that the children would get to see each other if appellant's parental rights were terminated. Aiken testified that the children could visit while they were in foster care and said, "And who is to [say] that somebody will not adopt all of them?" She further testified that "we don't know that they're going to be adopted in the homes that they're in particularly."

### 6. The Grandmother

The grandmother testified that the children had plenty of food, were well-clothed, and were disciplined by taking away privileges. She said that she did not spank the children, but disciplined them in the same way as appellant. She said that she would be willing to move out of the house if it would help appellant keep the children.

### 7. Kenneth Newman

Kenneth Newman, the grandmother's boyfriend, testified that he had lived in appellant's house one or two years and had moved out in January 2004.[9] He testified that appellant was not at the house when an ambulance was called for T.J. and that she had been gone about two or three hours. He further testified that, when appellant left the house, T.J. was all right. He said that, after appellant left, he saw Jackson go into the room where T.J. was, heard Jackson spanking or beating T.J., and heard T.J. crying. Newman said he did not interfere because Jackson had said he would discipline his child the way he wanted to.

Newman also testified that he never saw appellant whip the children. She disciplined them by sending them to their room or restricting their access to television or their bicycles. Newman admitted that he had convictions for the offenses of aggravated robbery, possession of drug paraphernalia, and criminal trespass. He also admitted that he had used illegal drugs, but said that he did not do so in the house.

---

**9.** Newman also testified that he moved out of appellant's house when Jackson's trial started, which was in April 2004.

## 8. Other Evidence

The signed Family Service Plan in the record shows, as one of four goals, that "Ericka Colbert will maintain housing that is safe and free of environmental hazards." In another section, it elaborates: "Ericka Colbert will locate and maintain appropriate housing." The plan does not indicate that appellant's three-bedroom home was unsafe or inappropriate, nor does it indicate that finding other housing was a condition of retaining her parental rights. Moreover, a February 2004 "Permanency Plan and Permanency Progress Report," which was filed with the trial court, stated, "Erika Colbert has located and maintained employment and has appropriate housing.... Ms. Colbert has employment and has provided CPS with a statement of earnings."

Aiken's testimony that appellant did not give additional attention to E.D.C. as requested was contradicted by Aiken's "CPS Monthly Summary/Assessment" for September 2004. Her notes for September 20, 2004 state, "Ms. Hornaday asked if [caseworker] could speak with mother about giving attention to [E.D.C.]." Aiken's notes for September 28, 2004 state, "[Mother] gave more attention to E.D.C. and held him on her lap for a few minutes."

### The Orders

In all five cases, the trial court entered a order terminating appellant's parental rights to her children. Each order also terminated the father's parental rights, but those terminations are not challenged in these appeals. Because both the mother's and father's parental rights were terminated, the trial court appointed DFPS as the sole managing conservator of the children.

With respect to appellant, each order provided as follows:

The Court finds by clear and convincing evidence that termination of the parent-child relationship between ERICKA SHANETTE COLBERT and the [child or children], the subject of this suit is in the [child or children's] best interest. Further, the Court finds by clear and convincing evidence that ERICKA SHANETTE COLBERT has:

> knowingly placed or knowingly allowed the [child or children] to remain in conditions or surroundings which endanger the physical or emotional well-being of the [child or children], pursuant to § 161.001(1)(D) of the Texas Family Code[.]

Appellant challenges the legal and factual sufficiency of the evidence to support these findings.

### Standard of Review

 "The natural right that exists between parents and their children is one of constitutional dimensions." *In re J.W.T.,* 872 S.W.2d 189, 194–95 (Tex.1994) (*quoting Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976)). A parent's right to "the companionship, care, custody and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (quoting *Stanley v. Ill.,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)). "Due process requires that the State support its allegations by at least clear and convincing evidence" to reduce the risk of erroneous termination. *Id.,* 455 U.S. at 747–48, 102 S.Ct. at 1391–92; *In re B.L.D.,* 113 S.W.3d 340, 353–54 (Tex.2003). Therefore, in a case terminating parental rights, we strictly scrutinize the proceedings and strictly construe the law in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985).

There is a strong presumption that it is in the best interest of the child to keep custody in the natural parent. *In re K.C.M.*, 4 S.W.3d 392, 395 (Tex.App.-Houston [1st Dist.] 1999, pet. denied), *disapproved on other grounds, In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002). DFPS has the burden to rebut this presumption by clear and convincing evidence. *Id.* To be clear and convincing, the proof must produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002). The distinction, often fine, between a legal-sufficiency and a factual-sufficiency review lies in how the evidence is viewed. *In re J.F.C.*, 96 S.W.3d at 266. In reviewing for legal sufficiency, we must look at all the evidence in the light most favorable to the finding to determine whether the evidence is such that a factfinder could reasonably have formed a firm belief or conviction that the finding was true. *Id.* We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard evidence that a reasonable factfinder could have disbelieved, but we do not disregard undisputed facts that do not support the finding. *Id.*

In a factual-sufficiency review, we consider the entire record to determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d at 28. If, in light of all the evidence, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.*, 96 S.W.3d at 266. If a court of appeals determines that the evidence is factually insufficient, it should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding. *Id.* at 267.

## Grounds for Termination

To terminate the parent-child relationship, a court must find by clear and convincing evidence that the parent has committed one of the acts listed in section 161.001(1) of the Family Code and that termination is in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.001(1), (2) (Vernon Supp.2006). The failure to prove either of these elements will prevent termination of a parent's rights. *See In re U.P.*, 105 S.W.3d 222, 229 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) ("Proof of one element does not relieve petitioner from establishing the other."). "[T]he best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents." *In re D.M.*, 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.).

### 1. Conditions or surroundings relating to the twins

In her first issue, appellant challenges the legal and factual sufficiency of the evidence to support the trial court's finding that she "knowingly placed or knowingly allowed the twins to remain in conditions or surroundings which endanger the physical or emotional well-being of the children" under section 161.001(1)(D) of the Family Code. Appellant argues that subsection (1)(D) requires the child to have actually been in conditions or surroundings that threaten the child and that there is no evidence that the twins were living in such conditions. Appellant also argues that Jackson's presence in appellant's home

eight months before the twins were born cannot be the legal basis for the twins' removal from her custody.

We agree. There is no evidence in the record to establish that the environment in appellant's home posed a danger to the twins. *See In re A.B.,* 125 S.W.3d 769, 775 (Tex.App.-Texarkana, 2003, pet.denied) ("Under this section, we look to see if the environment itself poses a danger to the child's physical or emotional well-being."). Appellant testified that DFPS did not visit the home before taking the twins. That testimony is uncontested. Therefore, DFPS had no basis on which to claim that the home environment posed a danger to the twins.

Although the grandmother was a part of that environment, and both Aiken and Cooney made it clear that they did not think she should be with the children, their opinions were not based on any evidence of harm or danger that she posed. Rather, they were based on the fact of the grandmother's past criminal record and did not take into account that there was no evidence of current illegal activity and that she was a source of financial and moral support for appellant. Cooney's child-advocate reports dated February 24, 2004, July 22, 2004, and November 16, 2004 stated "There are no present indications that Joann Colbert is currently involved with drugs." Furthermore, appellant's statement to the interviewer for the CCCC's family evaluation "that since her mother has been released from prison, she earned a GED, goes to Church, has obtained employment and no longer uses drugs" and "that her mother has changed and made a better life for herself" is uncontested.

Aiken and Cooney also objected to the grandmother's relationship with Newman, who may or may not have lived with appellant and the grandmother for the two and one-half months between the twins' birth and their removal from the home. Newman had lived with the grandmother and appellant for one to two years, and, although he admitted to drug use, he testified that he did not use drugs at the home. No evidence contradicts this testimony.

Aiken testified to the following reasons for taking the twins into custody: (1) appellant's previous history with DFPS; (2) the fact that the five older children were in custody; (3) appellant's testimony in the Jackson trial which, according to Aiken, showed that appellant misstated to DFPS the truth of what happened to T.J.; and (4) the fragility of the babies. These reasons are not related to the environment in the home when the twins were removed and therefore cannot support termination under subsection (1)(D).

 DFPS does not respond to appellant's arguments under her first issue. Instead, DFPS urges that, because the trial court did not file findings of fact separately, as required in rule 299a of the Texas Rules of Civil Procedure, this Court must affirm the judgment if any legal theory pleaded by DFPS is supported by the evidence.[10]

We rejected this same argument by DFPS in *Cervantes–Peterson v. Texas Department of Family & Protective Services,* 221 S.W.3d 244, 251 (Tex.App.-Houston [1st Dist.] 2006, no pet.). In *Cervantes–Peterson,* we pointed out that a trial court's recitation in the judgment of its ground for termination of parental rights is not a fact-finding that is prohibited under rule 299a of the Texas Rules of Civil Procedure. *Id.* at 251 (citing *In re A.I.G.,*

---

**10.** A party need not file a notice of appeal to bring a cross-point that presents alternate or additional grounds for affirming a judgment.

*Helton v. R.R. Comm'n,* 126 S.W.3d 111, 120 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

135 S.W.3d 687, 693–94 (Tex.App.-San Antonio 2003, no pet.)). The trial court in the instant cases, as in *Cervantes–Peterson* and *A.I.G.*, was simply stating the grounds for termination of parental rights, as required by section 161.206 of the Family Code.[11] Accordingly, we overrule DFPS's issue.

Here, there is no evidence favorable to the trial court's finding under subsection (1)(D). In fact, there are undisputed facts that are against the finding-the failure of DFPS to visit the home before deciding to remove the twins; the report stating, "There are no present indications that Joann Colbert is currently involved with drugs"; appellant's uncontested statement that the grandmother had turned her life around; and the grandmother's financial and moral support of appellant and her children. Even considering all the evidence in the light most favorable to the trial court's finding under subsection (1)(D), we hold that a factfinder could not have reasonably formed a firm belief or conviction that the finding was true with respect to the twins. Accordingly, we sustain appellant's first issue.

## 2. Best Interest of the five older children

 In her third issue, appellant challenges the factual sufficiency of the evidence to support the trial court's finding that termination of appellant's parental rights was in the best interest of D.N.C., E.D.C., J.D.M., T.L.J., and T.B.J. Texas courts have generally considered nine nonexclusive, nonexhaustive factors set out in *Holley v. Adams* in determining the best interest of the child. 544 S.W.2d 367 (Tex. 1976). Those factors are (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent, which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 372. We will consider the evidence as it relates to these factors.

1. *The desires of the children.* Hornaday agreed that all the children loved appellant. Hornaday further testified that the children were very much bonded with their mother. On the other hand, Aiken testified regarding the twice-monthly one-hour family visits, "My observation is that there's not a big bond with the children. My observation is that there is not a lot of nurturing that happens." When asked whether the children loved their mother, Aiken responded, "I believe they do."

Hornaday testified that D.N.C. wanted to come home. The CCCC's initial evaluation report stated that D.N.C. wanted to live with her mother. DFPS asserts that D.N.C.'s behavior following family visits—being "ugly to everyone" and yelling and screaming until midnight—while otherwise doing well in foster care is inconsistent with her stated desire to live with her mother. However, D.N.C.'s foster mother reported to DFPS that D.N.C. got angry and yelled that "no one" was helping her mother and that the foster mother was not helping her mother. Thus, D.N.C.'s poor behavior following family visits was more

---

**11.** "If the court finds by clear and convincing evidence grounds for termination of the parent-child relationship, it shall render an order terminating the parent-child relationship." Tex. Fam.Code Ann. § 161.206(a) (Vernon Supp.2006).

likely caused by her perception that her mother was not getting the help that she needed. DFPS's summary reports also indicate that, on one occasion, it was difficult to separate D.N.C. from her mother at the end of a family visit.

Hornaday testified that E.D.C. really loved his mother and that, although he was getting the structure he needed at the foster home, he rejected it because he wanted to be with his mother. Approximately one month before trial, a DePelchin Children's Services report noted that E.D.C. had a strong bond to his siblings and family. The report also noted that E.D.C. said he loved his foster parents. The CCCC's initial evaluation report stated that E.D.C. said that his mother is good, takes care of the children, and that he loves her. He wished to be back with his family. DFPS asserts that E.D.C. was depressed after a family visit because his mother did not talk to him and that E.D.C. says he likes school and his foster parents are good to him. These facts do not negate E.D.C.'s stated desire to live with his mother.

Williamson testified that, although J.D.M. lived with him most of the time, J.D.M. saw appellant as a mother figure and they had a close bond. Williamson testified that J.D.M. had gone back to live with appellant in September 2002 because he wanted to be with appellant and his brothers and sisters. Williamson further testified that, at the time of trial, J.D.M. wanted to live with Williamson but wanted to maintain contact with appellant and his sisters and brothers and that he sometimes spent weekends with appellant. Williamson testified that he felt that appellant and J.D.M. had a mother-son relationship and that appellant treated all the children the same.

There is nothing in the record to indicate the desires of T.L.J. and T.B.J.

DFPS cites T.B.J.'s refusal to get dressed and her saying that she did not want to go to the family visits as evidence of her desires. DFPS does not speculate regarding what those desires are, nor do we.

2. *Emotional and physical needs of the children now and in the future.* The record does not indicate that any of the children have special physical needs. There was evidence that the children were appropriately clothed and well-fed. However, D.N.C., E.D.C., T.L.J., and T.B.J. had some significant behavioral and emotional problems. Hornaday testified that the house was orderly, but that there was chaos—a "constant flow of traffic"—and that "there were always children present."

With respect to the individual children, Hornaday testified that D.N.C. was diagnosed as having attention-deficit-hyperactive disorder (ADHD) and was borderline mentally retarded, that E.D.C. also had ADHD and oppositional defiance, that T.L.J. was diagnosed as having ADHD, and that T.B.C. was identified as having behavior problems that included tantrums, fighting, and defiance of authority. Hornaday further testified that the children needed consistency, stability, structure, and patience. She said that they were getting some of those things at home, but that these children needed all of those things. Hornaday said that she did not know whether appellant could develop the necessary attributes to give the children the structure they need. Hornaday also said she had no opinion regarding the termination of appellant's parental rights. She expressed her opinion that the children would adjust and thrive if they were removed from the home. But Hornaday also testified that, if the children were returned home, she would continue to see them.

Cooney testified that appellant gave most of her time to the twins during family

visits and that the other five did not get equal time. But he admitted that he did not know if it was normal for a mother to spend more time with babies. Aiken testified that, from her observation of the family visits, she did not think appellant was bonded with the children or nurturing to them.

The evidence shows that appellant has been able to take care of the children's physical needs, but she will likely need some assistance in caring for their emotional needs.

3. *Emotional and physical danger to the children now and in the future.* DFPS contends that Department personnel were concerned for the safety of appellant's children. However, those concerns centered around appellant's failure to recognize that Jackson was responsible for T.J.'s death and Newman's presence in appellant's home. DFPS directs us to a June 2003 evaluation by the CCCC expressing the concern that appellant's "conflicted feelings regarding Mr. Jackson may prevent her from providing a safe environment for her children." That evaluation was made less than two months after DFPS became involved. Almost one year later, May 28, 2004, appellant's therapist sent a report to Aiken which showed that appellant had made "good" progress in recognizing Jackson's role in T.J.'s death and "moderate" progress in taking responsibility for her lack of protectiveness. DFPS characterizes these statements as "self-serving." However, they are not statements by appellant; they are the opinions of a therapist to whom DFPS referred appellant.

Jackson is no longer a threat to the children's safety, and there is no evidence that Newman ever was. The May 28, 2004 monthly report by appellant's therapist indicates that appellant had made good progress in understanding Jackson's mistakes and his involvement in the death of T.J. Although Aiken and Cooney both testified that, as late as May 2004, appellant did not believe that Jackson was responsible for T.J.'s death, they did not testify that she continued to believe so. At the termination trial, appellant testified that she no longer had any contact with Jackson. She said that a lot of "stuff" came out at his trial that she did not know and that she had to get the information "secondhand" because she was not allowed to sit in the courtroom.

Thus, there is no evidence that the children will be emotionally or physically endangered by being returned to appellant.

4. *Parental abilities.* The testimony of Hornaday, Cooney, and Aiken regarding the five older children when they were in appellant's home indicated that the atmosphere was chaotic, hectic, and unstructured. However, Newman testified that appellant was a good mother and that the children were well-fed and clothed. Appellant had completed parenting classes and said she no longer disciplined the children by spanking.

Hornaday testified that the five older children were getting some of the things they needed at home. She did not specify what needs were being met by appellant. Significantly, Hornaday testified that she had no opinion regarding the termination of appellant's parental rights. According to a "Permanency Plan/Permanency Progress Report" filed with the court on February 24, 2004, appellant was actively participating in individual and group therapy, had completed parenting classes, and was making progress toward alleviating the causes for the removal of the children. In addition, according to her therapist's monthly reports for April and May, appellant had made progress in the goals set for her. The only area in which the report showed that she made no progress was the

family's ability to communicate effectively and demonstrating appropriate parenting skills. However, this was not entirely within her control. Those skills were to be worked on in family therapy, and, although appellant's therapist's report dated May 28, 2004 shows the recommendation, "Begin Family Therapy," there is no evidence that family therapy was ever provided to appellant. At trial, Aiken testified that she was not disputing that appellant had completed the services that she was offered, although she later stated that appellant had not obtained appropriate housing—a claim that is contradicted by DFPS records.

5. *Programs available to assist in promoting the best interest of the children.* Appellant had already taken advantage of all programs offered to her to increase her ability to meet the needs of the children. These programs included parenting classes, anger management classes, and individual and group therapy. Aiken admitted that appellant had completed all the services she was offered. Appellant's therapist reported that appellant was making progress in all areas. Appellant also earned a GED and a license as a nurse's aid and was employed in health care.

6. *Plans for the children.* At· trial, when asked about her plans for the children, appellant stated, "I would do everything in my power to keep all their fathers away from them." She testified that, if the children are returned to her, the grandmother would move out to satisfy DFPS's requirement.[12]

DFPS's plans are to place the children for adoption. Although Aiken testified that the children were adoptable, she also said that she did not know that they would be adopted into their foster homes, and she did not provide any information regarding potential adoptive homes. In addition, she could not assure that the children would be able to visit each other after adoption.

7. *Stability of the home or proposed placement.* Appellant has demonstrated her stability by living in the same residence for several years, obtaining her GED and job training, and securing employment. In spite of DFPS's objections to the grandmother, her presence in the home appears to enhance the stability of the home because the grandmother provides family support for appellant. DFPS produced no evidence regarding the stability of any proposed placement for the children.

8. *Acts or omissions of the parent indicating parent-child relationship is not proper.* Knowing that Jackson was charged with injury to T.J., and having agreed with DFPS that she would not allow Jackson to be around her children, appellant let Jackson move into her home while he awaited trial.[13] DFPS also com-

12. In addition, the grandmother testified that, because Aiken and Cooney thought that she should not live with the children, she would move out if the children were returned. Aiken's and Cooney's objections to the grandmother were based on her past criminal record and her association with Newman, who, at the time of trial, was no longer living with her. We note that, in spite of her criminal record, there is no evidence in the record that the grandmother posed a danger to any of the children or that she continued to be involved in any criminal activity. DFPS knew at least by June 23, 2003 about the grandmother's criminal record through a Family Evaluation conducted by the CCCC approximately two weeks after DFPS took custody of the children. Yet DFPS placed four of the children in the grandmother's possession and left them there until December 2003.

13. In its brief, DFPS refers us generally to Section I of its brief for other acts and omissions of appellant. Section I comprises 27 pages of argument and authority relating to its section 161.001(1)(E) endangerment issue.

plains about appellant's failure to admit to the severity of T.J.'s bruises.

9. *Any excuse for acts or omissions of the parent.* Appellant testified that she let Jackson live with her and be around the children after she agreed that she would not because she did not think that Jackson was responsible for T.J.'s death. Appellant said that she could not believe that Jackson had severely beaten T.J. and that she was not allowed into the courtroom during his trial and did not see the evidence presented. At the termination hearing, appellant testified that she, at that time, believed that Jackson was the cause of T.J.'s death. Moreover, contrary to Aiken's statements, there is no evidence in the record that Jackson abused any of appellant's children.

Appellant contends that T.J. did not have severe bruising at the time appellant left the house on the day T.J. was beaten. Newman testified that when appellant left the house on that day, T.J. was "all right" and that appellant had no knowledge of what happened to T.J. after appellant left the house. There was no testimony establishing the extent of any bruising on T.J. after the first spanking, but before the beating on April 5, 2003. If appellant did not see T.J.'s bruises, she was not in a position to "admit" to the severity of the bruising to comply with DFPS's demands.

*Summary*

In weighing the *Holley* factors, we will necessarily consider some to be more important than others, depending on the facts of a case. Here, it seems clear that the three children who were old enough to express a preference wanted to live with their mother, or at least to continue their relationship with her, as is the case with J.D.M. Although DFPS may not agree

that this issue is undisputed, it presented no evidence that any of the children did not want to return to their mother. Aiken admitted that all the children love their mother. The desires of the children weigh in favor of appellant.

It is undisputed that appellant had completed all programs offered to her by DFPS. The only evidence offered by DFPS that appellant had not done everything she was asked to do was Aiken's testimony that appellant had not obtained appropriate housing. That evidence was not credible because it was contradicted by DFPS's records stating that appellant had appropriate housing. Appellant admitted that she had not contacted any agencies that could offer services for the children, but said she would if the children were returned to her. Appellant's diligence in doing all that DFPS asked of her weighs in her favor.

Neither appellant nor DFPS dwelt on future plans for the children. Appellant said she would try to keep the children's fathers away and would have her mother move out of the house to satisfy DFPS's requirements, and DFPS planned to place the children for adoption, although it did not yet have adoptive homes for all the children. Thus, this factor does not weigh on either side.

It is undisputed that appellant provided for the physical needs of the children by providing food, clothing, and shelter. However, the children have significant emotional needs, some of which appellant has not been able to fulfill. Three of the children were diagnosed as having ADHD, and they and a fourth child had a variety of behavior problems. The children were generally making better grades at school while in foster care. According to Horna-

However, DFPS does not direct us to any specific acts or omissions stated within those

pages, nor does it make any specific argument with reference to such acts or omissions.

day, most of the children's problems existed before DFPS became involved with the children. But the evidence suggests that some of the children's negative behavior was exacerbated by their separation from their mother. Appellant's ability to take care of the children's physical needs and some of their emotional needs weighs in her favor. However, her difficulty in providing for all their emotional needs weighs in favor of DFPS.

At the time of trial, there was no evidence that the children would have been in any danger by being returned to appellant because appellant and her mother were the only ones living in appellant's house. Aiken's testimony that she believed that all the children were abused and neglected, both physically and emotionally, is without support in the record. When asked for specifics, she said, "Well, their ability to socialize and how they socialize tells a great deal about what they have been exposed to previous to this.... [A]nd I believe they came to us with those types of behavior ... such as telling teachers to 'Kiss my butt' and using more graphic language than that." Aiken also testified that the children had nightmares, but those she discussed were related to the death of T.J. In its brief, DFPS also cites the fact that the children were sometimes disciplined by spanking and had various scars and old healed marks as evidence of physical abuse. DFPS does not direct us to anything in the record to show that these marks were the result of physical abuse, nor does it inform us of how it distinguishes between permissible physical punishment and physical abuse. Certainly, a child's use of somewhat crude language is not a basis for terminating the parent-child relationship. The physical-danger factor weighs in favor of appellant.

Relevant to appellant's parental abilities, Hornaday testified that the home atmosphere was chaotic, that appellant gave the children some of what they needed, but not all, and that she did not know whether appellant was capable of developing the attributes needed to parent the children. Hornaday did not specify the needs that appellant was not meeting, and her description of the chaos—that there were always children there—was merely stating the obvious about a family having five (now seven) children. Most important, Hornaday said she had no opinion regarding the termination of appellant's parental rights and that she would continue to work with the children if they were returned to their mother. Considering the love and attachment between appellant and her children and her success in complying with DFPS's requirements, appellant's parental abilities weigh in her favor.

DFPS argues that having eight children by four different fathers is an indication of appellant's instability. DFPS does not consider appellant's recent history. She has lived in the same house for several years and has obtained her GED, a license as a nurse's-aid, and a job. It is evident that she has worked on becoming more stable and capable of caring for her children. The stability factor weighs in favor of appellant.

Appellant's reason for allowing Jackson to be around the children while he waited to go on trial was her belief that he was not the cause of T.J.'s death. Her testimony that, after his conviction, she came to believe that Jackson caused T.J.'s death was corroborated by her therapist's reports to DFPS. This factor also weighs on the side of appellant.

Having considered the *Holley* factors as they apply in this case, we hold that the evidence in this case is factually insufficient to support the orders terminating appellant's parental rights to D.N.C., E.D.C., J.D.M., T.L.J., and T.B.J. because,

considering the entire record, a factfinder could not reasonably form a firm belief that the termination of appellant's parental rights was in the best interests of the children. Accordingly, we sustain appellant's third issue.

## DISPOSITION

### 1. The five older children

Having sustained appellant's third issue, we reverse the portion of the orders of the trial court terminating appellant's parental rights and awarding DFPS sole managing conservatorship in appeal numbers 01–04–01232–CV, 01–04–01233–CV, 01–05–00126–CV, and 01–05–00127–CV and remand those cases to the court below for further proceedings consistent with this opinion.

### 2. The twins

Having sustained appellant's first issue and overruled DFPS's cross-issue, we need not reach appellant's second issue regarding the best interest of the twins. We reverse the portion of the order related to the termination of appellant's parental rights in appeal number 01–05–00124–CV. Because the trial court appointed DFPS as managing conservator of the children under Family Code section 161.207 as a necessary consequence of the termination of the parental rights of both appellant and each of the children's fathers, and made no findings to support the appointment of DFPS as managing conservator with the termination of appellant's parental rights

under Family code section 263.404, we also reverse the portion of the order that appointed DFPS as the sole managing conservator.[14] *See* TEX. FAM.CODE ANN. § 263.404 (Vernon 2002) (allowing trial court to appoint DFPS as sole managing conservator without termination of parental rights when trial court makes specific findings).

When reversing the trial court's judgment or appealable order, we usually render the judgment or order that the trial court should have rendered. TEX.R.APP. P. 43.3. However, in a case involving the involuntary termination of parental rights, if the trial court does not order termination of the parent-child relationship, section 161.205 of the Family Code requires that the trial court either (1) deny the petition for termination or (2) render any order in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.205 (Vernon 2002). An appellate court is not in a position to determine whether simply to deny the petition for termination or to render some other order in the best interest of the child. Circumstances concerning the child or parent may have changed since the trial court rendered its order of termination, a matter that requires a factfinder. We are therefore unable to render a judgment that disposes of all remaining issues in the case and must remand the case in part to the trial court for further proceedings under section 161.205.[15] *See* TEX. R.APP. P. 43.3(a).

---

**14.** This Court is not reversing on unassigned error, as asserted by the dissent. DFPS's appointment as managing conservator was a consequence of the trial court's termination of both parents' rights. *See* TEX. FAM.CODE ANN. § 161.207 (Vernon 2002). Because we have reversed the termination of appellant, the circumstances requiring the appointment of a managing conservator under section 161.207 no longer exist, and reversal of the appointment of DFPS as managing conservator is a

consequence of reversing the termination of appellant's parental rights.

**15.** The dissent states that Family Code sections 161.205 and 263.404 are inapplicable to this appeal because the trial court "actually ordered the termination of Colbert's parental rights." That was true at the time the trial court rendered it original order of termination. However, section 161.205 becomes applicable on remand because we have re-

Accordingly, we render judgment in part in appeal number 01–05–00124–CV that appellant's parental rights are not terminated, and we remand the case to the trial court for the limited purpose of rendering an order, consistent with Family Code section 161.205, disposing of the portion of the petition relating to appellant.

Justice JENNINGS, concurring in part and dissenting in part.

A majority of the en banc court voted to deny the motion for en banc reconsideration.

Justice ALCALA filed an opinion dissenting from the denial of en banc reconsideration in which Justice JENNINGS joins.

Justice KEYES filed an opinion dissenting from the denial of en banc reconsideration.

TERRY JENNINGS, Justice, concurring in part and dissenting in part.

In appellate cause numbers 01–04–01232–CV, 01–04–01233–CV, 01–05–00126–CV, and 01–05–00127–CV, I concur in this Court's judgments that reverse the trial court's orders terminating the parental rights of appellant, Ericka Shanette Colbert, to her five older children.

In appellate cause number 01–05–00124–CV, I concur in this Court's judgment insofar as it reverses the trial court's order terminating the parental rights of Colbert to her twins and renders judgment that Colbert's parental rights to her twins are not terminated. However, the majority, citing sections 161.205 and 263.404 of the

versed the trial court order and have rendered judgment that appellant's parental rights are not terminated. Section 161.205 is the controlling authority for how the trial court must proceed on remand. *See Walker v. Department of Family and Protective Services,*

Texas Family Code, errs in reversing the portion of the trial court's order appointing the Department of Family & Protective Services ("DFPS") as the "sole managing conservator" of the twins. *See* TEX. FAM. CODE ANN. §§ 161.205, 263.404 (Vernon 2002). Accordingly, I respectfully dissent from this portion of this Court's judgment and its remanding of the case to the trial court "for the limited purpose of rendering an order disposing of the portion of the petition relating to appellant consistent with Family Code section 161.205."

In a suit to terminate the parent-child relationship, section 161.205 provides that "[i]f the court *does not order* termination of the parent-child relationship, the court shall" deny the petition or render any order in the best interest of the child. *Id.* § 161.205 (emphasis added). In regard to the review of the placement of children under the care of DFPS, section 263.404 provides that a court "may render a final order appointing the department as managing conservator of the child *without terminating* the rights of the parent" if the court finds that appointment of a parent as managing conservator would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development and it would not be in the child's best interest to appoint a relative or another person. *Id.* § 263.404(a) (emphasis added). Here, however, the trial court actually ordered the termination of Colbert's parental rights to her twins. Sections 161.205 and 263.404 are simply inapplicable to this appeal, and the majority errs in utilizing them in this case sua sponte.

—— S.W.3d ——, 2006 WL 3751456, No. 01–06–00253–CV (Tex.App.-Houston [1st Dist.] December 21, 2006, no pet. h.). Section 263.404 becomes applicable only if the trial court makes the findings required by that section.

Importantly, in addition to seeking the termination of Colbert's parental rights to her twins in its original petition, DFPS requested that the trial court appoint DFPS as sole managing conservator of the twins "[p]ursuant to §§ 153.005 and 263.404, Texas Family Code." *See id.* §§ 153.005, 263.404 (Vernon 2002). As noted above, section 263.404 is not applicable here. Section 153.005 provides that in a suit affecting the parent-child relationship, a court "may appoint a sole managing conservator or may appoint joint managing conservators." *Id.* § 153.005. A finding by the court that appointment of a parent as managing conservator would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development defeats the presumption that a parent should be appointed as managing conservator. *Id.* § 153.131 (Vernon 2002). Here, the trial court ordered the termination of Colbert's parental rights to her twins. It also appointed DFPS as the sole managing conservator of the twins, finding "this appointment to be in the best interest of the children," and granting DFPS specific rights and duties, including those rights and duties afforded to a nonparent appointed as a sole managing conservator under section 153.371 of the Texas Family Code. *Id.* § 153.371 (Vernon Supp.2006). Although Colbert, in her issues for our review, specifically challenges the trial court's order terminating her parental rights to her twins, she in no way challenges the portion of the trial court's order appointing DFPS as sole managing conservator of the twins or its finding that the appointment was in the best interest of the children. Thus, the majority errs in reversing the trial court's appointment on unassigned error. *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993); *U.S.A. Precision Machining Co. v. Marshall,* 95 S.W.3d 407, 412 n. 3 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

Moreover, although we have rendered judgment that Colbert's parental rights to her twins are not terminated, the trial court still has continuing, exclusive jurisdiction in regard to the twins in the underlying suit affecting the parent-child relationship, in which it appointed DFPS as sole managing conservator of the twins. *See* TEX. FAM.CODE ANN. §§ 155.001, 155.002 (Vernon 2002). As a court with continuing, exclusive jurisdiction, it may exercise its jurisdiction to modify its order regarding managing conservatorship. *Id.* § 155.003 (Vernon 2002). Thus, there is no need of a remand "for the limited purpose of rendering an order disposing of the portion of the petition relating to appellant consistent with Family Code section 161.205."

SAM NUCHIA, Judge, order denying motion for en banc reconsideration.

On this date, the Court considered appellee's motion for en banc reconsideration. The motion is hereby **denied**.

It is so **ORDERED.**

The en banc court consists of Chief Justice RADACK and Justices TAFT, NUCHIA, JENNINGS, KEYES, ALCALA, HANKS, HIGLEY, and BLAND.

Justice ALCALA, dissenting from the denial of en banc reconsideration, joined by Justice JENNINGS.

Justice KEYES, dissenting from the denial of en banc reconsideration.

ELSA ALCALA, Justice, dissenting from denial of en banc reconsideration.

I respectfully dissent from the denial of appellee's, Department of Family and Protective Services ("DFPS"), motion for en

banc reconsideration of the panel's decision to reverse the portion of the trial court's decree that appointed DFPS as the "sole managing conservator" of the children. This decision conflicts with prior decisions by our court that left in place the portion of the trial court's decree that appointed DFPS as the sole managing conservator of the children, although the portion of the decree that terminated the rights of the parent was reversed based on insufficiency of the evidence. *See Ruiz v. Dep't of Family & Protective Servs.*, 212 S.W.3d 804 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236 (Tex. App.-Houston [1st Dist.] 2006, no pet).

Under the posture of these cases, when our court reverses a decree terminating the rights of a parent, that reversal will also include a reversal and remand of the trial court's decree appointing DFPS as the sole managing conservator if Justice Nuchia or Justice Higley [1] preside over the case. However, under identical circumstances, a majority of the justices on our court will leave in place the trial court's decree appointing DFPS as the sole managing conservator when our court reverses a decree terminating the rights of a parent.[2] En banc consideration is therefore necessary to secure or maintain uniformity in this Court's decisions concerning whether we must reverse and remand the portion of the trial court's decree regarding the placement of DFPS as the sole managing conservator when we reverse the portion of the trial court's decree that terminates parental rights. *See* Tex.R.App. P. 41.2(c). I therefore vote for en banc reconsideration.

I would also hold that, absent an issue on appeal challenging the portion of the trial court's decree that places DFPS as the sole managing conservator, the issue is waived. I would not sua sponte remand the issue to the trial court, as the majority opinion and judgment does here. Appellant has not challenged the portion of the trial court's decree that appoints DFPS the sole managing conservator. An appellant can raise an issue on appeal that challenges the trial court's decree that appoints DFPS as the sole managing conservator. *See Cervantes–Peterson v. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255–56 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (stating that one issue on appeal asserted by Cervantes was that "[i]n light of the fact that the evidence is insufficient to support the court's decision to terminate [Cervantes]s] parental rights, it follows that it was not in [J.M.'s] best interest that [DFPS] be granted sole managing conservatorship of [J.M.].". The appellant here simply chose not to contest on appeal the trial court's decree that appointed DFPS as the sole managing conservator. Perhaps appellant has no dispute with the placement of DFPS as the sole managing conservator, which the Family Code provides can be DFPS whether the parental rights are terminated

---

1. Justices Nuchia and Higley are the panel members of the majority opinion here.

2. Justices Jennings, Hanks, and Higley comprised the panel in *Ruiz*, which did not alter the trial court's placement of the managing conservator, despite reversing for legal insufficiency the trial court's decision to terminate the parent's rights. *Ruiz v. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 819 (Tex. App.-Houston [1st Dist.] 2006, no pet.) ("We reverse the portion of the decree terminating the parent-child relationship....). Chief Justice Radack and Justices Alcala and Bland comprised the panel in *Yonko*, which did not alter the trial court's placement of the managing conservator, despite reversing for factual insufficiency the trial court's decision to terminate the parent's rights. *See Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 249 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

or not. *See* TEX. FAM.CODE ANN. § 153.005(b), § 263.401(d)(3) (Vernon 2002 & Supp.2006).[3] Regardless, I would hold that the failure of appellant to challenge that portion of the trial court's decree appointing DFPS as the sole managing conservator waives the issue for our review on appeal. *See Jacobs v. Satterwhite*, 65 S.W.3d 653, 655–56 (Tex.2001) (quoting *San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 209–10 (Tex.1990), for "well-established rule that grounds of error not asserted by points of error or argument in the court of appeals are waived"). I therefore disagree with the panel's sua sponte reversal and remand of the trial court's decree that makes DFPS the sole managing conservator.

EVELYN V. KEYES, Justice, dissenting from denial of en banc review.

I would grant en banc review to reconsider our holding in this case and in *Cervantes–Peterson v. Texas Department of Family & Protective Services*, 221 S.W.3d 244 (Tex.App.-Houston [1st Dist.] 2006, no pet.), and its other progeny in light of *In re J.F.C.*, 96 S.W.3d 256 (Tex.2003). *See* TEX.R.APP. P. 41.2 (en banc reconsideration disfavored "unless ... extraordinary circumstances require en banc consideration").

---

**3.** Section 153.005 provides:
 (b) A managing conservator must be a parent, a competent adult, an authorized agency, or a licensed child-placing agency.
TEX. FAM.CODE ANN. § 153.005(b) (Vernon 2002).
Section 263.401(d)(3) acknowledges that the DFPS can be appointed a managing conservator even if parental rights have not been terminated, stating,

(d) For purposes of this section a final order is one that:
 ...
 (3) without terminating the parent-child relationship, appoints the department as the managing conservator of the child.
TEX. FAM.CODE ANN. § 263.401(d)(3) (Vernon Supp.2006).