# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-12-00518-CV

---

**S. C., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 251,311-B, HONORABLE RICK MORRIS, JUDGE PRESIDING**

---

## M E M O R A N D U M  O P I N I O N

This is an appeal from an order terminating the parental rights of S.C. following a jury trial. In two issues on appeal, S.C. asserts that the district court lacked jurisdiction to render the termination order and that the evidence is legally and factually insufficient to support the jury's finding that termination is in the best interest of the child. We will affirm the termination order.

### BACKGROUND

The Texas Department of Family and Protective Services (the Department) filed a petition seeking to terminate S.C.'s parental rights to her children, four-year-old Y.R. and infant J.C. The termination suit was based in part on allegations that S.C. had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the

children; failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the children; and used a controlled substance in a manner that endangered the health or safety of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (P) (West Supp. 2012). Evidence considered by the jury during trial, which we will summarize below as it becomes relevant to our sufficiency analysis, included the testimony of S.C. and several witnesses for the Department with knowledge of the underlying facts. At the conclusion of trial, the jury found by clear and convincing evidence that one or more of the alleged grounds for termination were proven and that termination was in the children's best interest. *See id*. § 161.001(1), (2). In accordance with these findings, the district court rendered a final order terminating S.C.'s parental rights. This appeal followed.

**ANALYSIS**

**Jurisdiction**

In her first issue, S.C. asserts that the 146th District Court did not have jurisdiction to render the termination order because a different Bell County district court, the 169th, had continuing, exclusive jurisdiction. Consequently, in S.C.'s view, the termination order was "void" for lack of subject-matter jurisdiction and should therefore be vacated.

Section 155.001 of the family code provides that "[e]xcept as otherwise provided by this section, a court acquires continuing, exclusive jurisdiction over the matters provided for by this title in connection with a child on the rendition of a final order." *Id*. § 155.001(a) (West 2008). "If a court of this state has acquired continuing, exclusive jurisdiction, no other court of this state has jurisdiction of a suit with regard to that child except as provided by this chapter or Chapter 262."

2

*Id*. § 155.001(c).  Moreover, "[e]xcept as otherwise provided by this subchapter, a court with continuing, exclusive jurisdiction retains jurisdiction of the parties and matters provided by this title."  *Id*. § 155.002 (West 2008).

The family code requires that the petitioner or the trial court request from the bureau of vital statistics identification of the court that last had continuing, exclusive jurisdiction of the child in a suit, unless the petition alleges that no court has continuing, exclusive jurisdiction of the child and the issue is not disputed by the pleadings.  *Id*. § 155.101(a)(1) (West 2008).  "If a request for information from the bureau of vital statistics relating to the identity of the court having continuing, exclusive jurisdiction of the child has been made under this subchapter, a final order, except an order of dismissal, may not be rendered until the information is filed with the court."  *Id*. § 155.104(a) (West 2008).  "If a final order is rendered in the absence of the filing of the information from the bureau of vital statistics, the order is voidable on a showing that a court other than the court that rendered the order had continuing, exclusive jurisdiction."  *Id*. § 155.104(b).  If a court in which a suit is filed determines that another court has continuing, exclusive jurisdiction of the child, the court in which the suit is filed shall dismiss the suit without prejudice.  *Id*. § 155.102 (West 2008).

On the other hand, suits brought by a government entity to protect the health and safety of a child, such as the suit in this case, "may be filed in a court with jurisdiction to hear the suit in the county in which the child is found."  *Id*. § 262.002 (West 2008).  In other words, such suits need not be filed in the court with continuing, exclusive jurisdiction.  However, once the court in which suit is filed renders a temporary order, "the governmental entity shall request

3

identification of a court of continuing, exclusive jurisdiction as provided by Chapter 155."[1]  *Id.*

§ 262.202 (West 2008).  Then, on the motion of a party or the court's own motion, if applicable, the

court that rendered the temporary order shall transfer the suit to the court of continuing, exclusive

jurisdiction, if any.  *Id.*  § 262.203(a) (West 2008).  A motion to transfer filed under Chapter 262

"may be filed separately from the petition and is timely if filed while the case is pending."  *Id.*

§ 262.203(b).

> This Court has jurisdiction of this suit pursuant to Chapter 262 of the Texas
> Family Code, and Petitioner believes no other Court has continuing, exclusive
> jurisdiction over the children.  In accordance with § 155.101(a), Texas Family Code,
> the Department will request that the Bureau of Vital Statistics identify the court that
> last had continuing, exclusive jurisdiction, or confirm that the children have not been
> the subject of a suit resulting in a Court of continuing jurisdiction.

The record does not reflect what subsequent actions, if any, the Department undertook to verify that

no other court had continuing, exclusive jurisdiction of the children subject to this suit.  In its brief,

the Department represents that "a search of the District Court's records did not reveal any previously

filed cases with the names of these children."  However, the Department also acknowledges that it

"fail[ed] to request identification of a court of continuing, exclusive jurisdiction as required" by the

family code provisions summarized above.

It is undisputed that in 2007, an associate judge of the 169th District Court of

Bell County signed a child-support order in a case involving Y.R., one of the children later subject

---

[1] Through this provision, Chapter 262 incorporates by reference the procedures in
Chapter 155 for determining the court of continuing, exclusive jurisdiction.

to the termination suit. The child-support order appointed S.C. and T.R., the child's parents, as joint managing conservators of the child.[2] According to the Department, at the initial show-cause hearing in the termination suit, which was held approximately one year prior to the final hearing, "all parties were aware that there had been a prior child-support order somewhere," but they did not know whether a final order had been entered and, if so, which court had rendered it. The termination case proceeded to trial without any party seeking to transfer the suit or challenging the district court's jurisdiction to render the termination order.

However, after the termination order was rendered, S.C. filed an amended motion for new trial in which she raised a "plea to the jurisdiction" and a motion to dismiss, claiming for the first time that the 169th District Court of Bell County was the court of continuing, exclusive jurisdiction over the children subject to the suit and that the 146th District Court of Bell County "lacks the subject matter jurisdiction to enter a decree of termination in this case." As evidence, S.C. filed a copy of the 2007 child-support order signed by the associate judge. The Department did not file a response to the motion for new trial or dispute the allegations in the plea to the jurisdiction, but instead filed a motion to consolidate both the child-support case and the termination case in the 146th District Court, the court that rendered the order of termination. The district court granted the Department's motion to consolidate and denied S.C.'s motion for new trial, plea to the jurisdiction, and motion to dismiss.

---

[2] Although the child-support order referred to a Y.C. rather than Y.R., it is undisputed that Y.C. is the same child as Y.R., one of the children named in the termination suit. Although the surnames are different, the child's first name, date of birth, county of birth, and other identifying information is identical in both the child-support order and the order of termination. Emphasizing this discrepancy, the Department suggests that "even if a request for identification to vital statistics were made, it may have come back with inaccurate information."

S.C.'s challenge to the 146th District Court's "jurisdiction" rests on several debatable propositions, including that the concept of "continuing, exclusive jurisdiction" is truly jurisdictional and thus cannot be waived by inaction;[3] that the 146th and 169th District Courts, both of Bell County, are considered different courts for present purposes;[4] and that any "jurisdictional"

---

[3] This Court has previously suggested that while "standing alone, section 155.001 may appear to establish by its strong language a rigid jurisdictional rule, the statutory scheme surrounding that provision reveals that it is designed to operate more in the nature of dominant jurisdiction or venue, rather than true jurisdiction." *Ramsey v. Ramsey*, 19 S.W.3d 548, 554 n.7 (Tex. App.—Austin 2000, no pet.). However, some of our sister courts have concluded that the provision is truly jurisdictional. *See, e.g.*, *Celestine v. Dep't of Family & Protective Servs.*, 321 S.W.3d 222, 230 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (concluding that "the Family Code's continuing and exclusive jurisdiction provision is a matter of true jurisdiction" and that "when one court has continuing and exclusive jurisdiction over a matter, any order or judgment issued by another court pertaining to the same matter is void"); *In re Aguilera*, 37 S.W.3d 43, 49, 52 (Tex. App.—El Paso 2000, orig. proceeding) (adhering to view that "the concept of continuing, exclusive jurisdiction is truly jurisdictional" and holding that order rendered by court without continuing, exclusive jurisdiction was void); *see also Alexander v. Russell*, 699 S.W.2d 209, 210-11 (Tex. 1985) (per curiam) (holding that "because the record does not show that the court with continuing and exclusive jurisdiction was actually the court which exercised jurisdiction in terminating [father's] parental rights, the cause must be reversed and remanded").

[4] As a practical matter, courts in the same county routinely exchange judges and cases, including in SAPCRs, and this practice is authorized by law. *See* Tex. Const. art. V, § 11 ("District Judges may exchange districts, or hold courts for each other when they may deem it expedient, and shall do so when required by law."); Tex. Gov't Code Ann. § 74.094 (West 2005) ("A district or statutory county court judge may hear and determine a matter pending in any district or statutory county court in the county regardless of whether the matter is preliminary or final or whether there is a judgment in the matter. The judge may sign a judgment or order in any of the courts regardless of whether the case is transferred. The judgment, order, or action is valid and binding as if the case were pending in the court of the judge who acts in the matter."); *see also* Tex. R. Civ. P. 330(e) ("Where in such county there are two or more district courts having civil jurisdiction, the judges of such courts may, in their discretion, exchange benches or districts from time to time, and may transfer cases and other proceedings from one court to another, and any of them may in his own courtroom try and determine any case or proceeding pending in another court without having the case transferred . . . ."), (g) ("Where in such counties there are two or more district courts having civil jurisdiction, any judge may hear any part of any case or proceeding pending in any of said courts and determine the same, or may hear and determine any question in any case, and any other judge may complete the hearing and render judgment in the case."), (h) (providing that in counties with two or more district courts having civil jurisdiction, "any judge

6

problem with the case being tried in the 146th District Court was not cured by the district court's consolidation order.[5]  However, assuming without deciding that each of these propositions is valid, we still could not conclude on this record that the district court erred in denying S.C.'s plea to the jurisdiction and motion to dismiss, or abused its discretion in overruling S.C.'s new-trial motion.

It is undisputed that the children subject to this suit were found in Bell County. Therefore, it was permissible for the Department to file its Chapter 262 suit in either the 146th or 169th District Courts, both of which have jurisdiction over SAPCRs filed in Bell County.  *See* Tex. Fam. Code Ann. §§ 155.001(c), 262.002; Tex. Gov't Code Ann. §§ 24.247(a), 24.358(a) (West 2004); *see also* Tex. Const. art. V, § 8 ("District court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.").  It is also undisputed that the Department filed

may hear and determine" motions and other matters and that "[a]ny judgment rendered or action taken by any judge in any of said courts in the county shall be valid and binding").

In light of these and other provisions, the Fort Worth Court of Appeals has held that "chapter 155 of the family code does not prohibit a district court of continuing, exclusive jurisdiction from transferring, on its own motion, a case to another district court in the same county for purposes of docket equalization." *In re G.R.M.*, 45 S.W.3d 764, 771 (Tex. App.—Fort Worth 2001, no pet.). Similarly, the San Antonio Court of Appeals has held that when one court has continuing, exclusive jurisdiction over a matter in a SAPCR, a judge from a different court in the same county may rule on that matter, but only if the record is "clear, in the absence of competent evidence to the contrary" that the judge is acting on behalf of the court with continuing, exclusive jurisdiction. *See In re Garza*, 981 S.W.2d 438, 441 (Tex. App.—San Antonio 1998, orig. proceeding).

[5] *See, e.g.*, *Aguilera*, 37 S.W.3d at 49-50 (concluding that consolidation of multiple SAPCRs into single cause in one court "accomplished the same purpose" as motion to transfer); *In re Miller*, 583 S.W.2d 872, 873 (Tex. Civ. App.—Dallas 1979, orig. proceeding) ("Consolidation of the various suits into one suit affecting the parent-child relationship and investing only one court with power to rule on issues affecting the child provides an effective way to give courts access to more information and leaves them wide latitude in dealing with the best interests of the child.").

suit in the 146th District Court in accordance with local rules of procedure which authorized child-protection cases to be filed in that court,[6] and S.C. does not contend that these rules violate any statutory provision. Accordingly, the termination order rendered by the 146th District Court would be "void" only on a showing that a different court had continuing, exclusive jurisdiction. *See* Tex. Fam. Code Ann. § 155.104(b) ("If a final order is rendered in the absence of the filing of the information from the bureau of vital statistics, the order is voidable on a showing that a court other than the court that rendered the order had continuing, exclusive jurisdiction.").

The district court would not have erred or abused its discretion in failing to find that such a showing was made in this case. A court acquires continuing, exclusive jurisdiction over a child on the rendition of a *final* order. *Id*. § 155.001(a). Here, the sole evidence of a prior order from the 169th District Court is the 2007 child-support order signed by an associate judge. Although an order signed by an associate judge can in some cases become a final order of the court, *see, e.g.*, *Garza v. Texas Dep't of Family & Protective Servs.*, 212 S.W.3d 373, 376-77 (Tex. App.—Austin 2006, no pet.), there is nothing in the record showing that is what occurred here. *See* Tex. Fam. Code Ann. § 201.013(b) (West 2008) (providing that in cases in which no appeal is taken from an associate judge's proposed order, "the proposed order or judgment of the associate judge becomes the order or judgment of the referring court only on the referring court's signing the proposed order or judgment"). Without the rendition of a final order, a court cannot become the

---

[6] *See, e.g.*, Standing Order for Rules and Procedures for Child Protective Services Cases in Bell and Lampasas Counties, R. 1.1 (providing for referral and assignment of CPS cases to associate judge of Cen-Tex Child Protection Foster Care Court); Tex. Dist. Ct. Bell Cty. Loc. R. 3 ("All Department of Human Resource Cases, half of all Civil Cases, and a fourth of Domestic Relations Cases (divorces, adoptions, contempt, change of conditions and custody) shall be filed in the 146th District Court.").

court of continuing, exclusive jurisdiction. *See* Tex. Fam. Code Ann. § 155.001(a); *see also Trevino v. Ables*, 943 S.W.2d 166, 168 (Tex. App.—San Antonio 1997, orig. proceeding) (finding that divorce decree in record was not final order and therefore did not create court of continuing, exclusive jurisdiction); *Ex parte Sustrik*, 721 S.W.2d 592, 593 (Tex. App.—Fort Worth 1986, orig. proceeding) (relator contended that orders of 360th District Court of Tarrant County were void because 325th District Court of same county was court of continuing, exclusive jurisdiction; appeals court rejected contention because "there is no indication from the record that the 325th District Court ever entered a final decree in this case"); *In re G.A.J.*, No. 01-12-00256-CV, 2012 Tex. App. LEXIS 8562, at *6-7 (Tex. App.—Houston [1st Dist.] Oct. 11, 2012, no pet. h.) (mem. op.) (finding that prior SAPCRs did not give rise to continuing, exclusive jurisdiction because they did not involve final orders). On this record, the district court's implied failure to find that S.C. made the required showing that the 169th District Court was the court of continuing, exclusive jurisdiction was supported by legally and factually sufficient evidence. Accordingly, the district court did not err in denying S.C.'s plea to the jurisdiction and motion to dismiss or abuse its discretion in overruling her motion for new trial. We overrule S.C.'s first issue.

**Evidentiary sufficiency**

S.C. does not challenge the termination order as to J.C., the infant, nor dispute that at least one of the submitted termination grounds regarding Y.R. is supported by legally and factually sufficient evidence. However, in her second issue, S.C. asserts that the evidence is legally and factually insufficient to support the jury's finding that termination of the parent-child relationship was in the best interest of Y.R. According to S.C., "the record provides uncontroverted expert

9

testimony that termination of the parent-child relationship would not be in the child's best interest due to the bonding and attachment of Y.R. to her mother and recommendations from all expert providers that the child's needs may be met through conservatorship orders." We disagree.

### Standard and scope of review

A court may terminate parental rights based on findings by clear and convincing evidence that (1) a parent has committed any of several statutory bases for termination and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2009); *Holley v. Adams*, 544 S.W.2d 367, 370-72 (Tex. 1976). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

In a legal sufficiency review of a finding terminating parental rights, an appellate court reviews all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal sufficiency review, a reviewing court must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id*. An appellate court disregards all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id*.

In a factual sufficiency review of a finding terminating parental rights, the inquiry is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction

about the truth of the Department's allegations. *Id.* A court of appeals must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *Id.* A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

In reviewing the best-interest determination, we consider: the child's wishes, her emotional and physical needs now and in the future, the emotional or physical danger posed to the child now and in the future, the parenting skills of those seeking custody, programs available to assist those seeking custody to promote the child's best interest, plans for the child's future, the stability of the home, any conduct by the parent that might show that the existing parent-child relationship is improper or harmful, and any excuse for that conduct. *Holley*, 544 S.W.2d at 372. The *Holley* factors, while providing guidance, are not exhaustive, nor must all factors be proved for us to affirm a verdict in favor of termination. *C.H.*, 89 S.W.3d at 27.

### Evidence considered by the jury

S.C. testified that she has been pregnant five times. According to S.C., her first pregnancy ended in a miscarriage of twins, while the children from her second and third pregnancies were stillborn. S.C. added that the children from her fourth and fifth pregnancies, Y.R. and J.C. (the children subject of this suit), were both born premature. S.C. testified that she had smoked marihuana during both of these pregnancies. According to the evidence presented, after J.C. was

11

born prematurely on June 22, 2011, he was placed in the neonatal intensive care unit ("NICU") at a local hospital.

S.C. recalled that on July 5, 2011, at approximately 3:00 a.m., she contacted the hospital to check on J.C., and a nurse informed her that J.C. would be circumcised and then released the following day. S.C. testified that the nurse requested that she come to the hospital as soon as possible. At the time, S.C. explained, she lived with her then four-year-old daughter Y.R. in an apartment she had previously shared with Y.R.'s father, T.R. S.C. testified that T.R. had ceased to reside there following an episode of domestic violence.

S.C. also testified that at 6:00 a.m., S.C. called T.R. to request that he take care of Y.R. while she went to the hospital because, she claimed, Y.R. would not be allowed in the NICU, and that she would not have been able to attend to both J.C. and Y.R. if she had to stay overnight.[7] According to S.C., T.R. agreed to come over after he finished his "paper route." S.C. admitted that before he arrived, she left the apartment leaving Y.R. unsupervised. She claimed that she stopped at a fast-food restaurant several blocks away to call and confirm that T.R. was on his way, and then boarded a bus for the two-hour ride from Killeen to the hospital in Temple.

S.C. explained that when she arrived at the hospital, she again called T.R. to make sure he was with Y.R. S.C. added that when she informed T.R. that she would have to stay overnight, he threatened to leave Y.R. alone unattended. S.C. returned to Killeen, she claimed, out

---

[7] S.C. initially testified that she could not bring Y.R. to the hospital because she knew she would have to stay overnight. She later testified that, when she left her apartment, she "didn't think [she] would be [at the hospital] long, maybe about an hour or two."

of fear for Y.R.'s safety. According to S.C., she missed the bus and had to convince a stranger she had met in the hospital parking lot, Yvonne Hardy, to give her a ride back to Killeen.

S.C. further testified that when she returned to her apartment, she and T.R. began to argue about whether or not T.R. should pay a portion of rent for the apartment, even though he no longer lived there.[8] According to a police report of the incident, T.R. was also upset because he had recently learned that he was not J.C.'s biological father.[9] S.C. recalled that at some point during the argument, she placed Y.R. in the car with Hardy and went inside the apartment to continue the argument with T.R., which, according to S.C., grew more heated. S.C. admitted that eventually, she hit T.R. because of his refusal to pay rent. S.C. could not remember how many times she had hit him,[10] but she claimed that she had used an open hand and that, because of her recent C-section, she "couldn't fight that hard." S.C. also claimed that T.R. had hit her in return, "so much so that it put a hole" in the wall.

At some point during the fight, the police were called. Chris Williams, an officer with the Killeen Police Department, testified that when he arrived at the apartment, T.R. informed him that S.C. had kicked a hole in the apartment wall after she had agreed to move out and then

---

[8] S.C. testified that they had previously agreed that T.R. would pay $200 per month for rent, in addition to $300 per month that he paid in child support.

[9] At trial, S.C. could not identify J.C.'s biological father, although DNA testing had established that T.R was not J.C.'s father. When asked to explain her inability to identify the father, S.C. testified that after T.R. had left her "with a house full of bills and a full-time college student with one child, I didn't know what to do. How am I going to pay for all this?" The State then asked S.C. if she had "prostituted" herself to pay her bills. S.C. rejected this characterization, but nonetheless acknowledged, "I think sometimes we make wrong choices."

[10] S.C. later testified that she had hit him only one time, while T.R., according to S.C., had hit her more than once.

13

grabbed T.R. around the neck and choked him. According to Williams, T.R. claimed that he did not strike back because he feared going to jail.

S.C. initially testified that she did not speak to the police prior to her arrest. However, when confronted with a copy of the police report indicating that she did in fact speak to them, she said, "Oh, well, I didn't have any say-so in what was going on." According to Officer Williams, when he spoke to S.C., she claimed that T.R. had damaged the wall and that their argument was not physical. Williams added that S.C. had no physical marks or scratches, but T.R. had fresh scratches on his neck, which, in Williams's opinion, were consistent with someone trying to choke him. Williams testified that he did not believe S.C.'s account of the fight, and instead believed that S.C. had been the aggressor in the situation. Accordingly, he arrested S.C. for assault that caused bodily injury to a family member. S.C. testified that upon her arrest, she left Y.R. with Hardy, the woman whom she had just met at the hospital. S.C. admitted that when she did so, she had no idea when she would be released from police custody.[11]

The case was initially investigated by Child Protective Services (CPS) investigator Jennifer Steimer, who had left CPS by the time of trial. Steimer had prepared an affidavit based in part on interviews with S.C., T.R., Y.R., and others involved in the case. According to Steimer's affidavit: (1) Hardy brought Y.R. to CPS on the afternoon of July 5, 2011, following S.C.'s arrest for domestic violence; (2) during Y.R.'s interview with CPS, Y.R. indicated that she had been left home alone many times and that she had seen her father punch holes in the wall, as well as her parents fighting and using bad language; (3) during T.R.'s interview with CPS, he had informed CPS

---

[11] S.C. spent twenty-four days in jail before she was released.

that he had a pending criminal case involving domestic violence with S.C. and had been involved in at least four other instances of domestic violence with S.C; and (4) CPS had visited Y.R.'s infant brother J.C. at the hospital and learned that the child had the drugs Ozazapam, Temazepan, and Ephedrine in his system at birth[12] and that S.C. had informed the hospital social worker that she had smoked marihuana until twenty-five weeks into her pregnancy with J.C.

Deborah Thornton, a Child Protective Services (CPS) investigative supervisor, testified that while S.C. was in jail, she was visited by a CPS caseworker who attempted to find a suitable temporary placement for Y.R. Thornton explained that S.C. first recommended a friend, who was unwilling to take Y.R., and then S.C.'s parents in Oklahoma, including S.C.'s father who, the evidence tended to show, had a history of physical abuse. According to Thornton, S.C. had a history of unstable living arrangements, including having lived in a shelter twice during two different pregnancies and facing eviction from her current apartment. Thornton testified that based on this history, CPS was concerned that the children would not have a place to live upon S.C.'s release from jail.

The children were subsequently placed in foster care with Jennifer Molver. Molver testified that Y.R. eventually had to be removed from her care due to Y.R.'s aggressive behavior. According to Molver, on Y.R.'s first night at her house, Y.R. choked one of Molver's dogs. Molver also claimed that Y.R. had repeatedly hit Molver's other dog, exhibited aggressive behavior toward a neighbor's two-year-old child, and became aggressive and threatening when reprimanded. On one

---

[12] Although S.C. testified that she was prescribed these drugs for her high-risk pregnancy, according to Steimer's affidavit, J.C.'s doctor had informed CPS that it was unlikely that the first two drugs were so prescribed.

15

occasion, Molver recalled, Y.R. had threatened to call CPS to take Molver to jail if she did not buy Y.R. something she wanted. Molver attributed some of this behavior to Y.R. missing her mother and wanting to return to her home. After approximately one-and-a-half months, Molver requested that CPS remove Y.R. from her care.

Carrie Green, a conservatorship caseworker for the Department, testified that she met with Y.R. and J.C. while they were staying with Molver. Green reported additional negative behaviors on the part of Y.R., including that Y.R. had "snuck out" of Molver's house on one occasion and told a neighbor that Molver had left her home alone. According to Green, Y.R. later told neighbors that Molver was not feeding or taking care of her. Green also testified that Y.R. made what Green characterized as "sexually inappropriate" noises and suffered from what Green described as "loose boundaries" and "relaxed attachments." For example, Green explained that Y.R. had told Green that she loved her the first day they met. Y.R. was subsequently removed from Molver's care and eventually was placed with the Harringtons, the child's paternal grandparents. Molver testified that she has continued to interact with Y.R. after she was placed with the Harringtons. According to Molver, Y.R. now appears "very polite," "very calm now," and "very well mannered." Molver added that she considers Y.R. to be less "threatening" now and "extremely happy."

Willean Harrington, Y.R.'s paternal grandmother and her current foster mother, testified that she has worked at the Army Exchange Services ("AAFES") for approximately nineteen years and has been married to her husband, an AAFES truck driver, for twenty-two years. Harrington explained that Y.R. has lived with them since September 2011 but had stayed with them in the past. According to Harrington, when Y.R. was eighteen months old, S.C. left Y.R. with T.R.,

16

and T.R. then brought Y.R. to the Harringtons where she stayed for three months. At the time, Harrington recalled, she did not know where S.C. was or how long she would be gone.

Harrington further testified that when Y.R. had first moved in with her and her husband, Y.R. was "very unhappy" and "nervous." According to Harrington, Y.R. exhibited abnormal behavior, including repeatedly wetting herself at day care. Harrington added that Y.R.'s behavior had since improved. Harrington testified that she and her husband love Y.R., that they would be very protective of her, and that they want to keep her safe. Harrington also believed that it would be "scary" for Y.R. to return to S.C.

Harrington also described multiple incidents of violence instigated by S.C. Approximately three years before trial, Harrington testified, she had witnessed S.C. choke T.R. during an argument outside their apartment. On another occasion, Harrington recalled, she saw S.C. slap T.R. in the Harringtons' garage. Harrington also described an incident in which S.C. had attempted to attack her with a badminton racket during an argument. Harrington testified that she had attempted to restrain S.C., but S.C. was able to bite her left breast, causing pain and bleeding. Harrington went to the hospital to treat her wounds, but did not report the incident to the police. Harrington further testified to another occasion in which she had driven T.R. to S.C.'s apartment, T.R. went inside, and an argument ensued. Harrington recalled T.R. returning to the car with S.C. in pursuit. According to Harrington, T.R. attempted to lock the car doors, but S.C., who was pregnant at the time, was able to get inside the vehicle and tried to climb over the seats to get to Harrington. Harrington added that T.R. grabbed S.C., pulled her out of the car, and they both fell to the ground. This incident, according to Harrington, led to T.R.'s arrest for domestic violence. Harrington also recalled a court hearing in which the Department had informed S.C. that it would seek to place Y.R.

17

with the Harringtons permanently. Harrington testified that following this hearing, S.C. had used abusive language toward her and had threatened to take Y.R. and "leave the jurisdiction."

In order to have the opportunity to be reunited with Y.R., S.C. was required to comply with the terms of a service plan prepared by the Department. One requirement of the service plan was for S.C. to maintain stable housing. S.C. testified that upon her release from jail, she started work at a McDonald's restaurant and moved in with a friend named "Jessica" whose last name she could not recall. According to S.C., she lived rent-free with Jessica for approximately three to five months, although she never provided the address to her caseworker. After that, S.C. explained, she lived with "numerous friends." S.C. claimed that she had reported the various addresses and names to her lawyer and her caseworker, but according to Department records, she did not do so. S.C. also testified that at one point, she moved into a hotel with T.R. even though she had been instructed not to have further contact with him, and she claimed that she had informed the Department when she and T.R. moved back in together. Later, S.C. and T.R. moved in with another friend. In total, the evidence tended to show that S.C. lived in five or six different locations between August 2011 and February 2012, when she moved into an apartment of her own with Y.R. S.C.'s caseworker, Carrie Green, visited the apartment. In a written report prepared for the final hearing, Green noted that the apartment contained no bedroom furniture, almost no food, and five liquor bottles. S.C. testified that since Green's visit, she has furnished the apartment and that Green had "nothing negative" to say during a more recent visit.

S.C was also required to obtain and maintain steady employment to meet her own and Y.R.'s needs. S.C. testified that she left her job at McDonald's in mid-October 2011 to work at a Little Caesar's pizza restaurant. According to Green, after S.C. left Little Caesar's

18

in November 2011, S.C. failed to provide any further income verification to the Department as required. In her report, Green also noted that she had received conflicting reports of S.C.'s employment status—T.R. had told her that S.C. was unemployed after she had left Little Caesar's, while S.C. claimed that she had continued to work. At trial, S.C. testified that she was currently enrolled as a full-time student and worked part-time for the last two months as a caregiver for an elderly woman. S.C. added that she worked twenty hours per week and made $6 per hour. S.C. also testified that she received Pell grants and student loans to cover her other costs.[13]

S.C. was also required to refrain from any illegal drug use and to submit to random drug tests. As part of her service plan, S.C. was required to provide three clean drug screens before she could regain visitation rights. Green testified that during meetings with S.C., she had discussed the terms of the mandatory random drug screens with S.C. as well as the Department's policy that a missed test is considered a positive screen. According to Green, S.C. had submitted a drug test in September 2011, a day after it was requested, which counted as a positive screen. Green added, however, that S.C. had subsequently submitted three clean drug screens and regained her visitation rights. Green further testified that in April 2012, S.C. missed another scheduled test but attempted to take the test the following day, which, Green explained, counted as an "automatic positive" according to Department policy. S.C. testified that she was unaware of this policy and claimed that Green had told her that she could take the test the next day, but Green disputed this. Green also testified that when S.C. had tried to take the test the day after it was scheduled, S.C. did not provide a sufficient sample to conduct the urinalysis. S.C. claimed that she was unaware of the problem with

---

[13] S.C. testified that she received approximately $7,000 per semester in loans. She claimed that she spent one thousand dollars of those funds on Y.R.

the sample until after she had left the testing facility. However, Department records indicate that S.C. was informed of the inadequate sample but that she had insisted on leaving without providing a proper sample.

Green further testified that she had offered S.C. the chance to take a hair follicle test instead of a urine test. According to Green, the hair follicle test was offered because it had the ability to assess whether drugs had been in S.C.'s system over a longer time period and "was an opportunity for [S.C.] to show that she was being clean and that way there was no room for suspicion or any type of confusion based on her not submitting enough urine for the UA." Green claimed that S.C. refused to take this test because she "knew how far back they go."[14]

S.C. was also required to attend individual counseling. Green testified that S.C. was discharged from her first two counselors after missing numerous appointments. S.C. attributed both discharges to problems with scheduling and transportation. Specifically, S.C. testified that she was unable to attend appointments with her first counselor because there was no bus stop near her office. However, the Department introduced evidence tending to show that there was a bus stop within a block of the counselor's office.

S.C. was further required to pay $150 per month in child support, which, according to Green, S.C. had never paid. S.C. claimed that the reason for the non-payment was that Y.R.'s foster parents, the Harringtons, had refused to accept any payments she had attempted to make to

---

[14] S.C. initially testified that a hair follicle test was not offered to her. She later claimed that one was demanded. S.C. admitted that she never took the test but claimed that she never refused to take it. Rather, she testified that the test was never scheduled. Department records, however, indicate that she "refused to submit a hair follicle as requested on April 18, 2012." Green testified that when she suggested the follicle test, S.C. "became very irate and stated that she would not submit to a hair test."

them. S.C. also testified that the child-support payments she had received from T.R. were deposited into an account from which S.C. could withdraw using a debit card. S.C. added that the Harringtons refused to accept the debit card from her because it was in her name. S.C. also claimed that she had spent the child-support money on items for Y.R., including clothes, candy, and gifts. S.C. added, however, that she kept no receipts of these purchases.

S.C. was also required to attend parenting classes, which she completed, and submit to a psychological evaluation, which was conducted in August 2011. The evaluation, which was admitted into evidence, indicated that S.C.'s "capacity to appropriately parent her children appears to be poor at this time." The evaluation further noted that S.C. had a "grandiose opinion of her own talents and abilities," a "long history of abuse of illegal substances," and a "significant history of domestic violence."

S.C. was also required to participate in supervised visits with Y.R. Green testified that she had supervised at least fifty percent of the visits between S.C. and Y.R. Green recalled that during these visits, Y.R. appeared to enjoy spending time with S.C. However, Green also testified that S.C. missed a number of scheduled visits. Green explained that after missing several visits, S.C. informed her caseworker that she no longer wished to attend the visitations. According to S.C., Green had suggested that her visitations be canceled, but Green denied making this suggestion. Green testified that S.C. had requested that her visitations be reinstated, but, according to Green, S.C. never provided the necessary clean drug screens to regain her visitation rights. Green added that S.C. was able to see Y.R. once a week at court-ordered family therapy sessions.

S.C. was further required to not engage in any criminal activities. The evidence tended to show that S.C. also failed to comply with this requirement. While the case was pending,

S.C. had admitted to using marihuana and to driving a car without a license. S.C. also allegedly assaulted T.R. in a Wal-Mart less than two weeks before trial. Officer Justin Schlaudraff responded to the alleged assault. Schlaudraff testified that he was unable to speak with S.C. because she had left the scene before he arrived. However, Schlaudraff was able to speak with T.R. According to Schlaudraff, T.R. claimed that S.C. had assaulted him in the store by hitting him in the head with a closed fist after he refused to get back together with her. T.R. subsequently signed an affirmation that he wished to file charges against S.C. for assault.

The alleged assault was recorded by the store's security camera, and a copy of the recording was admitted into evidence. When shown a copy of the recording during her testimony, S.C. refused to comment and invoked her right against self-incrimination. When questioned about other incidents of violence in her past, S.C. declared that she was not a "fighter." S.C. also denied that at a prior hearing in this case, she had to be escorted out of the courtroom by two bailiffs. Instead, S.C. claimed that she chose to stay between the bailiffs while walking out to "keep [her] mind correct," because she was "a little beside" herself. S.C. also denied a subsequent altercation with T.R. in the courthouse parking lot.

Green testified that she, too, sometimes was the target of what she characterized as S.C.'s hostility, anger, and threats. Specifically, Green explained that in May 2012, following a hearing, S.C. told Green not to look at her and referred to her as a "wench." Green also testified that she had observed S.C. yelling and pushing T.R. at the courthouse, while T.R. did not respond or exhibit similar aggressive behavior. Green testified that she likely would have called the police if two bailiffs had not arrived to defuse the situation.

22

According to Green, before T.R. had relinquished his parental rights to Y.R., he had met with Green and informed her that he believed relinquishment was in Y.R.'s best interest because his parents, the Harringtons, could provide stability for Y.R. Green testified that the Department had conducted a home study on the Harringtons, concluded that they were a suitable placement, and placed Y.R. with the Harringtons in September 2011. Green added that Y.R. was doing well and had progressed from her initial negative behaviors. Green described Y.R. as "happy, healthy," and loving toward the Harringtons.

Green testified that at the December 2011 permanency hearing, she believed that S.C. had made "adequate progress" toward completing her service plan. However, in Green's view, at the March 2012 permanency hearing, S.C. had made "negative progress," and the Department's permanency goal was changed from reunification to adoption. In reviewing S.C.'s family service plan, Green noted that S.C. had missed a number of visits with Y.R., did not satisfy the requirement that she not use any illegal or illicit drugs, had engaged in criminal conduct by assaulting T.R., managed only "sporadic" employment and housing, never paid child support, and was discharged by two counselors for missing meetings. According to Green, S.C. had failed to demonstrate the ability to meet her children's basic needs and ensure their safety.

The change in the Department's permanency goal was also based on S.C.'s alleged statement to Green in January 2012 that she no longer wanted to work toward reunification. Specifically, Green claimed that S.C. had told her that she wanted Molver to adopt J.C. and for Y.R. to remain with the Harringtons for "four or five years." Green further testified that after she had counseled S.C. against that time frame, S.C. requested that Y.R. stay with the Harringtons for "at least two years" so S.C. could "get on her feet." S.C. denied that she had made either of these

23

requests. Instead, she claimed that "for a year's time I asked that instead of [Y.R.] coming directly home, that she stay with her grandmother." However, S.C. also acknowledged in her testimony that she was not yet ready to take full custody of Y.R.

The Department sought to terminate all of S.C.'s rights to both children so that they could be adopted—J.C. by Molver, and Y.R. by the Harringtons. Green testified that she had concluded that termination of S.C.'s parental rights was in Y.R.'s best interest because S.C. had not demonstrated an ability to maintain stability and safety for Y.R. Green also feared that if Y.R. was returned to S.C., Y.R. would once again exhibit negative behavior.

Jamie Love, a therapist, testified as an expert in clinical child psychology. Love explained that beginning in August 2011, she had met with Y.R. individually for approximately thirty-five one hour sessions focused on Y.R.'s present behavior as well as what Love characterized as Y.R.'s "post-traumatic stress" symptoms, which Love believed had resulted from Y.R.'s exposure to "significant domestic violence" and being left unsupervised. According to Love, Y.R. exhibited "sexualized behaviors," although Y.R. never told Love that T.R. had sexually abused her.[15] Love also testified that Y.R. told her that she frequently witnessed domestic violence while living with S.C., and that those events still scared her. Love testified that she had witnessed Y.R. "disassociate" as a result of what Love characterized as post-traumatic stress disorder and exhibit aggressive

---

[15] During the pendency of this case, the Department had investigated allegations of sexual abuse against T.R. Green explained that at the beginning of the case, Y.R. had made an outcry to a CPS caseworker that her father had sexually abused her. However, Green added that Y.R.'s outcry was "not consistent" and that Y.R. had a tendency to say something and then "take it back." Green also testified that Y.R. had participated in a Child Advocacy Center interview but had made no outcry at that time, and had participated in a physical exam, which did not indicate sexual abuse. The Department eventually made a finding that it was "unable to determine" if the allegations against T.R. were true.

24

behavior with animals and other people. Love added that Y.R.'s behaviors had improved over the last two months of treatment.

In her testimony, Love also expressed concern with returning Y.R. to S.C. Specifically, Love testified that Y.R. remained frightened of S.C.'s aggressive behavior. Love added that she believes Y.R. attaches to individuals indiscriminately. For example, Love recalled that two weeks before trial, Y.R. told her that she would like to live with her. According to Love, Y.R. might be able to attach to the Harringtons and had not exhibited any disrespectful behavior towards Mrs. Harrington in several months. Love believed that Mrs. Harrington would keep Y.R. safe. Love also testified that it would be possible for Y.R. to achieve normalcy if reunited with S.C., but expressed concern about the recent Wal-Mart incident in which S.C. had assaulted T.R. Love added that if S.C.'s violent behavior persisted, returning Y.R. to S.C. would be harmful to the child. Love also emphasized her "strong concerns about the violence" that S.C. continues to exhibit and the damage that Y.R. suffered as a result, as well as the "significant progress" Y.R. had made while living with the Harringtons. Love believed that it would be "extremely detrimental" for Y.R. to go back to S.C. Consequently, Love concluded that terminating S.C.'s parental rights in order for the Harringtons to adopt Y.R. would be in Y.R.'s best interest.

The court had also ordered S.C. and Y.R. to attend family therapy sessions with social worker Linda Malsbary. Malsbary testified that she had conducted "nine or ten" hour-long family therapy sessions with S.C. and Y.R. over the three-month period prior to trial. Malsbary initially claimed that S.C. did not miss any sessions, but she later acknowledged that S.C. had missed two sessions—one due to a conflicting court hearing, the other when Y.R. went on a field trip. Malsbary testified that S.C. was able to "anticipate her daughter's needs," and brought her a variety

25

of things, including snacks, clothes, and books. Malsbary further testified that she recommended that S.C. continue in family therapy because the sessions benefitted both S.C. and Y.R., and, according to Malsbary, Y.R. was beginning to "open up a lot about some very deep feelings that she's been having."

Malsbary testified that during their sessions, S.C. was "very excited" to see Y.R., that she "responded with lots of love, affection, [and] words of praise," and that she engaged in "reclaiming behaviors," including fixing Y.R.'s hair, checking her teeth and skin, and providing new clothes. In turn, Malsbary described Y.R. as "very happy" to see S.C., and very thankful for the items S.C. provided. Y.R. would sit in S.C.'s lap, tell her she loved and missed her, take pictures of her, and say that she wanted to see S.C. again. Malsbary described S.C. as nurturing, cooperative, and understanding and added that she had never witnessed Y.R. act out or engage in angry, aggressive play. According to Malsbary, Y.R. had indicated to her that she would prefer to live with S.C. rather than her grandparents and had always remained in close proximity to S.C., which Malsbary believed was a sign of attachment and bonding. Malsbary also believed that S.C. had been a good mother based on the strength of the attachment.

Malsbary acknowledged that S.C. had made a "poor choice" when she left Y.R. unattended to visit J.C. in the hospital and again when she left J.C. with a stranger after she was arrested. However, Malsbary claimed that Y.R. may have fabricated her claim that S.C. had left her at home alone numerous times. Malsbary testified that she was unaware that S.C. had "a lot of angry outbursts" and claimed that both parents had problems with anger. Malsbary believed that Green had suggested that S.C. "take a break from visitation" because of the stress associated with relinquishing the rights to her infant son. Malsbary testified that she was unaware that, according

26

to Green, S.C. had made the request to suspend visitation and that, after she had changed her mind, visitation remained suspended because she had failed to provide clean drug screens.

Malsbary also testified that S.C. had smoked marihuana at least once during the case when she was feeling particularly distressed over Y.R.'s potential adoption. According to Malsbary, S.C. had taken drug tests other than the hair follicle test which S.C. had refused, and Malsbary claimed that these other tests have "all been clean." However, Malsbary acknowledged that she did not know how many tests S.C. was required to take and how many she may have missed.

Malsbary believed that S.C.'s parental rights should not be terminated and that termination would not be in Y.R.'s best interest. Malsbary testified that she believed that S.C. had substantially complied with her service plan and that the strong bond between S.C. and Y.R. would make attachment with the Harringtons difficult. Malsbary was also concerned by Y.R.'s accusations of sexual abuse against T.R. and T.R.'s ability to be part of Y.R.'s life if she remained with the Harringtons.[16] Malsbary added that she had never met T.R. or engaged in therapy concerning the alleged sexual abuse, and, despite her concerns, she acknowledged that S.C. did not believe the accusations and had attempted to reunite with T.R. numerous times. Malsbary also testified that she believed that most of Y.R.'s negative emotional responses stemmed from being separated from S.C., and that termination would lead to further emotional problems for Y.R. However, Malsbary admitted that she had never seen the Harringtons and Y.R. interact.

Cathy Rothas, the children's guardian ad litem, testified that she had met with Y.R. at school and discussed her current placement. According to Rothas, Y.R. had told her that she

---

[16] Mrs. Harrington testified that T.R. currently is allowed only supervised visitation of Y.R., and that, if the Harringtons adopted Y.R., he would not be allowed to live with them.

was happy and liked staying with the Harringtons. Rothas described Y.R. as a "happy, friendly little girl." Based on this meeting and her review of the various reports and histories, Rothas concluded that it was in Y.R.'s best interest for the Harringtons to adopt her. Rothas also recommended termination of S.C.'s parental rights but acknowledged that she had never observed Y.R. and S.C. interact together.

Debbie McKinney also acted as the children's guardian ad litem later in the case. She testified that she had not met with S.C. or seen S.C. and Y.R. interact. However, McKinney also testified that she had met with Y.R. once when Y.R. was four years old. During their meeting, according to McKinney, Y.R. exhibited concerning behavior that McKinney described as "no stranger danger." McKinney explained that this meant that Y.R. hugged McKinney and generally acted "extremely excited" to be around her even though they had never met. McKinney characterized these behaviors as unsafe and testified that they demonstrated a lack of boundaries and were indicative of Y.R.'s exposure to "a lot of different people in her life," potentially including S.C.'s multiple romantic partners. McKinney added that Y.R. also acted out sexually and made sexual advances toward another foster child. Specifically, according to McKinney, Y.R. removed her underwear, spread her legs, and invited the five-year-old boy to "come over to her so that they could play husband and wife." Based on Y.R.'s young age, McKinney believed that Y.R. must have witnessed adults engage in sexual acts, either in person or in movies. McKinney testified that S.C., through her actions, had placed Y.R. in a "very precarious position" and that Y.R.'s sexual behaviors were a product of the environment in which S.C. had raised her. Consequently, McKinney believed that termination of S.C.'s parental rights was in Y.R.'s best interest.

*Analysis*

Viewing the above evidence in the light most favorable to the jury's finding, the evidence tended to show that S.C. had a history of violent and threatening behavior toward others, including multiple assaults committed against the father of one of her children, had used drugs while pregnant with her children, had left her four-year-old daughter home alone on multiple occasions and, on another occasion following her arrest for domestic violence, had left the child in the care of a woman whom she had known for approximately thirty minutes. From this and other evidence, the jury could have reasonably inferred that it was not safe for the child to be around her mother. Additionally, the evidence tended to show that the child had a history of aggressive and sexually inappropriate behavior that, according to the testimony of multiple witnesses, was likely modeled after behavior that Y.R. had observed while in the care of S.C. Moreover, throughout the case, S.C. had exhibited what the jury could have reasonably inferred was behavior that could ultimately harm Y.R., including unstable employment, relationships, and living arrangements, a refusal to take certain drug tests as required by her service plan, ambivalent feelings about reuniting with her daughter, and past attempts to reconcile with the man who, S.C. claimed, was physically abusive toward her. Also, multiple witnesses who had spent extensive time with Y.R., including the child's therapist, guardian ad litems, and caregivers, all testified that they believed Y.R. should not be reunited with her mother and that the Department's plan for Y.R. to be adopted by her paternal grandparents would be a better option for the child's well-being. Based on this and other evidence, we conclude that the evidence is legally sufficient to support the jury's finding that termination was in the child's best interest. *See J.F.C.*, 96 S.W.3d at 266.

We reach the same conclusion regarding the factual sufficiency of the evidence. The evidence contrary to the jury's best-interest finding consisted of the testimony of S.C. and the social worker, Linda Malsbary. The jury was free to disbelieve S.C.'s self-interested testimony, which, the jury could have reasonably found, repeatedly conflicted with that of the caseworkers and other experts involved in the case. As for Malsbary's belief that it was not in Y.R.'s best interest for S.C.'s parental rights to be terminated, Malsbury had become involved with the case only recently and for a brief time, specifically for "nine or ten" hour-long family therapy sessions with S.C. and Y.R. over the three-month period prior to trial. Her opinion conflicted with the opinions of numerous other witnesses who had spent significantly more time interacting with the mother and the child, and the jury was free to resolve the conflicting testimony in favor of the Department's theory of the case. Unlike in the cases cited by S.C. in her brief,[17] there is nothing in this record that would allow us to conclude that the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is "so significant" that a fact-finder could not reasonably have formed a firm belief or conviction that termination of S.C.'s parental rights was in Y.R.'s best interest. *See id.* On

---

[17] *See, e.g.*, *Colbert v. Dep't of Family & Protective Servs.*, 227 S.W.3d 799, 814-15 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (finding evidence factually insufficient to support jury's best-interest finding because mother had complied with requirements of service plan, her children wanted to live with her, and "there was no evidence that the children would have been in any danger by being returned" to their mother); *In re W.C.*, 98 S.W.3d 753, 765-66 (Tex. App.—Fort Worth 2003, no pet.) (finding evidence factually insufficient to support jury's best-interest finding because "the evidence is uncontradicted that appellant has done everything the Department required of her"); *see also Gibbs v. Texas Dep't of Family & Protective Servs.*, No. 03-11-00320-CV, 2012 Tex. App. LEXIS 5902, at \*34-36 (Tex. App.—Austin July 19, 2012, no pet.) (mem. op.) (finding evidence factually insufficient to support jury's best-interest finding because "the overwhelming weight of the evidence, mostly through uncontroverted testimony by objective, uninterested expert witnesses was that it is in the children's best interest for [the parent] to maintain his rights to [the children]").

this record, we conclude that the evidence is factually sufficient to support the jury's finding that termination was in Y.R.'s best interest.

We overrule S.C.'s second issue.

## CONCLUSION

We affirm the termination order.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   January 10, 2013