

# Fourth Court of Appeals
## San Antonio, Texas

## DISSENTING OPINION

No. 04-19-00228-CV

**IN THE INTEREST OF T.N.J.J.**, D.J., and B.B.M., Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-02673
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Irene Rios, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:    Rebeca C. Martinez, Justice
            Irene Rios, Justice
            Liza A. Rodriguez, Justice

Delivered and Filed: November 27, 2019

Because I believe the evidence was factually insufficient to support the trial court's best-interest finding, I respectfully dissent. I would sustain Father's two issues and, consequently, reverse the trial court's termination order in part and remand for further proceedings.

### FAILURE TO ADMIT PATERNITY

Initially, because the majority does not reach Father's first issue after it upheld the court's judgment to terminate, I begin by addressing whether the trial court erred by terminating his parental rights based on the ground that Father did not admit paternity. The trial court's termination order summarily found Father, after being served with citation, did not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160. TEX. FAM. CODE ANN. § 161.002(b)(1). "[T]here are no formalities that must be observed when filing an admission of paternity or for such an admission to be effective." *In re S.J.R.-Z.*, 537 S.W.3d

677, 681 (Tex. App.—San Antonio 2017, pet. denied) (internal quotations omitted). "In fact, by appearing at trial and admitting that he is the child's father, an alleged father triggers his right to require the Department to prove one of the grounds for termination under section 161.001(1) and that termination is in the best interest of the child." *Id.* at 681–82 (internal quotations omitted).

Here, Father appeared at trial and testified that he was the father of T.N.J.J., D.J., and B.B.M. Father's trial counsel maintained that Father was the children's father, and counsel advocated against termination of Father's parental rights. Under these circumstances, I would have concluded that Father's appearance and participation in the trial court, including his sworn testimony that he was the children's father, was sufficient to trigger his right to have the Department prove grounds for termination under section 161.001. *See id.* (sustaining challenge to termination order based on a father's failure to assert paternity where the father appeared at trial, testified that he was the children's father, father's trial counsel maintained father was the children's father, and trial counsel advocated against termination). Father's first issue should be sustained.

## BEST INTEREST OF THE CHILDREN

On this record, I do not agree with the majority that the trial court's best interest finding is supported by factually sufficient evidence. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In considering whether the evidence rises to the level of being "clear and convincing," the Department's evidence

contained in this record before us is insufficient for the fact finder to reasonably form a firm belief or conviction as to the truth of the allegation sought to be established.

*Evidence Adduced at Trial*

The Department presented two witnesses at trial; both were caseworkers. Vanessa Batts testified that she was the caseworker from November 2017 to July 2018. She testified that B.B.M. tested positive for amphetamines and marijuana when he was born in November 2017. According to Batts, at the time B.B.M. was born, the mother and Father admitted to drug use, and the Department took all three children into their custody because of the parents' drug use. The Department's attorney asked Batts whether the mother and Father were the primary caregivers for the children, and Batts responded "Yes," without specifying the basis for her knowledge. Batts stated she prepared a family service plan for the case and that she went over the plan with Father. Batts believed that Father understood the plan.

The trial court adopted Father's family service plan in pre-trial orders, and a copy of the service plan is included in the record on appeal.[1] The family service plan specifies that Father "will attend and participate fully in [a drug] assessment and WILL FOLLOW ALL RECOMMENDATIONS." The plan specifies as to random drug testing:

> [Father] will participate in random URINE ANALYSIS testing at [clinic name and address.] The clinic is open 9:00am-5pm, and the parent must arrive at least 1 hour prior to closing. [Father] will test by the end of the business day that the Department makes contact.

---

[1] Although the trial court did not state that it took judicial notice of the clerk's record or the family service plan contained within the record, we may presume the trial court took notice of the plan because a trial court is "presumed to have taken judicial notice of the records in the court's file without any request being made and without an announcement that it has done so." *In re S.J.S.*, No. 04-12-00067-CV, 2012 WL 2450817, at *6 (Tex. App.—San Antonio June 27, 2012, pet. denied) (mem. op.). Of course, neither we nor the trial court may take judicial notice of the *truth* of allegations contained in the plan or other documents in the record. *In re R.S.D.*, 446 S.W.3d 816, 820 n.4 (Tex. App.—San Antonio 2014, no pet.).

The family service plan required Father to attend and participate in a psychological evaluation and follow all recommendations from the assessment. Separately, the family service plan states as to counseling:

> [Father] will attend any counseling or therapy sessions *he is able to* and provide caseworker with those reports. [Father] will schedule, attend, and actively participate in individual counseling at Serenity Family Services to address individual issues/goals as well as the concerns/goals of the Department.

(emphasis added). Further, Father's family service plan required him to complete parenting classes.

Batts testified that Father's compliance with the service plan "was very minimal." She stated Father only completed his psychological assessment while she was the caseworker. According to Batts, there were recommendations based on the psychological assessment; however, Batts did not specify what those recommendations were. Batts testified Father completed only one drug test, which was specifically ordered by the trial court, and that he tested positive.[2] The record shows the trial court ordered Father to take a drug test on May 24, 2018, which was approximately eight months before trial. Batts testified that Father did not attend any other drug tests that she required of him, and that Father did not give reasons for his failures to attend.

The Department's evidence is sparse as to the children's first three placements after removal. Batts only testified regarding the children's first two placements. According to Batts, the children's first placement after removal was with the paternal step-grandmother. Father was authorized to visit the children at this placement without restrictions. Batts testified that she did not know how often Father visited the children at the step-grandmother's home, and Batts never observed any of Father's visits with the children. Batts had concerns about the initial placement because the step-grandmother could not provide the names of multiple individuals in the home

---

[2] The Department did not offer into evidence the drug test results to reveal what drug was detected.

during several visits Batts made to the home. Batts also testified that the step-grandmother moved without authorization while she had custody of the children. According to Batts, the children's second caregiver[3] picked the children up from the home of their maternal grandmother. Batts believed, based on the pick-up at the maternal grandmother's home, that the mother had contact with the children during the course of the case, but Batts "d[idn't] have any proof." Batts did not recall whether Father was ordered to pay child support; the record on appeal does not show that he was. Batts testified that she had concerns about Father's "stability" because she did not know whether Father had a stable residence, and that Father did not provide proof that he had a job.

Asta Builderback was the Department's second caseworker, who was assigned to the case in August 2018. Builderback testified that, when she was first assigned to the case, Father was not engaged with his services. Builderback testified that Father only completed his parenting classes. As to his other services, Builderback testified:

> He was supposed to drug test, and he did not drug test. He was supposed to go to counseling. He started with Serenity. He was dismissed for no shows. I referred him again to Serenity. And I referred him also to the McCullough Center, and he went to none of them.

Builderback specified that she attempted to set up four drug tests for Father, but he failed to attend any of the four appointments. As to the last test, Builderback stated that Father told her he did not attend because he had no identification card. Builderback testified that Father completed a drug assessment and that treatment was recommended. She further testified that Father was aware of the recommendation and could attend outpatient treatment, but Father did not engage in treatment. Builderback testified that Father did not have stable housing throughout the case, and that she did

---

[3] The other caseworker, Asta Builderback, testified that the second caregiver was "a relative." Neither Batts nor Builderback provided the date the children moved to the second caregiver's home. According to Batts, the step-grandmother stated multiple times that she could not keep the children long-term.

not know where Father was living at the time of trial. Builderback testified Father had not provided her proof of employment but claimed to be working through a temporary-employment agency.

Builderback testified that Father could visit the children as often as he pleased while the children were placed with relatives, but she did not know how often he visited. Builderback stated that the children had been placed first with their paternal step-grandmother, then another relative, and then with a paternal aunt. According to Builderback, the paternal aunt could not make a long-term commitment to the children, and, therefore, the Department placed the children in a foster home in Plano, Texas, where the children resided at the time of trial. Builderback testified that Father had not visited the children in the foster home since their move there in December 2018. Father's counsel asked Builderback why Father had not been permitted to visit the children, and Builderback responded: "I asked [Father] if he had transportation, and he said no. . . . I could have set [visits] up in Plano at anytime." Builderback testified that the children do not have any special medical needs or behavioral problems, and that they are doing "extremely well" with their foster parents. Builderback testified that the baby, B.B.M., had dry, flakey skin and hair before moving to the foster home, and, after his move, his skin cleared up. According to Builderback, the oldest child T.N.J.J. could be a child, and not a caregiver to the younger siblings after the move. The middle child, D.J. was "very happy" at the foster placement. Builderback answered affirmatively when asked whether the foster placement "could lead to permanency," but did not explain the basis for her statement.[4]

Lastly, Builderback testified she did not believe Father had the capacity to care for his children because:

---

[4] "A child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in a best-interest determination." *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (internal citation omitted).

Father does not have a stable income. He has not had any housing. He has given me a variety of relatives that are willing, and they could not take the children. So I still have no stability. And the father has not completed any of his services.[5] And there is no security for the children.

When asked whether she thought Father had engaged in visitation enough to demonstrate that he had learned from the [parenting] program, Builderback answered, "No," although she had earlier testified that she had no knowledge as to the number of visits Father made while the children were at previous placements.

Next, Father testified. He stated that he was the children's primary caregiver prior to the Department's involvement, and that his family supported him in raising the children. Father testified that he last had a relationship with the mother in 2012 and did not know the mother's whereabouts prior to B.B.M.'s birth. Father also testified that he was unaware of the mother's drug use history and her use of drugs while pregnant with B.B.M. The Department's attorney asked Father: "So in 2017 in November, your children said that [the mother] was living with you. Is that not correct?" Father answered, "No, that's not correct."

Father testified that he attended six counseling classes, and he completed a drug assessment. According to Father, he was not instructed to complete drug treatment and was told that his attendance at Narcotics Anonymous and Alcoholic Anonymous classes was voluntary. Father testified that he attended three Narcotics Anonymous and Alcoholics Anonymous classes.[6] On cross examination, Father affirmed that he was aware he needed to engage in drug treatment. When asked whether he had a drug problem in the past, Father answered: "No, ma'am. I mean, I smoked marijuana, but that's about it. No addiction to whatever."

---

[5] Builderback's statement contradicts her earlier testimony that Father had completed his parenting classes.
[6] Father's testimony is ambiguous as to whether he attended three Narcotics Anonymous classes, three Alcoholics Anonymous classes, or a combination of the two. He testified: "I attended three of those classes."

Father testified that he missed multiple drug tests and explained his absence to four of the scheduled tests. Father explained that he missed two tests because the tests were scheduled for the same days as his parenting classes, and he chose to attend the parenting classes because the drug tests could be rescheduled. According to Father, one test was scheduled for a Saturday, and the testing location was closed. As to the last test, Father testified the test conflicted with his work schedule. Father stated that, to accommodate his job, he visited a 24-hour testing location and offered to pay for the test himself, but the testing location required a referral. Father testified that he requested a referral to a 24-hour testing location from Builderback, but she told him there were no such locations available.

Father further testified that he was currently employed with an oilfield services company "going on a month now." He testified that he worked approximately 120 hours and earned $1,300 per week. Father also testified that he lived in a motel but intended to rent an apartment on the Monday following trial. Father stated that he had beds and supplies for the children.

At closing, the Department requested termination and argued that Father had failed to provide a safe, stable home for the children, and the children were currently in a placement that "[could] lead to permanency." The Department also stated that Father had not finished any drug treatment, and it "ha[d] serious concerns regarding his ability to take care of these children." The children's attorney ad litem also requested termination and argued: "I've been hoping that dad would step up and do what he needed to do to become stable to be able to raise these kids[, but] . . . dad didn't do what he needed to do." The court appointed child advocate likewise recommended termination and noted the children were doing well in their foster placement.

Father's attorney argued that termination should be denied because Father had substantially complied with his family service plan by completing his parenting classes, his drug assessment,

his psychological evaluation, and by attending some counseling sessions. Father's attorney argued that Father did not understand that he was required to complete drug treatment, and that he engaged in some Alcoholics Anonymous and Narcotics Anonymous classes. Counsel asserted Father was employed and had actively planned to obtain housing for himself and his children. Counsel concluded that Father was the caregiver prior to the case, and Father sought to maintain his parental rights to "continue to work to demonstrate that he [could] provide for his children."

The trial court remarked the case "[was] very challenging." According to the trial court, the independent assessments indicated that Father had fallen short of achieving a stable environment for the children. The trial court noted that Father was working but, nevertheless, speculated that Father's heavy work schedule could prevent him from giving attention to the children, "not to mention the cost of raising three children." The trial court also stated that the children's attachment to the Father needed to be weighed.[7] The trial court took the case under advisement, and later issued an order terminating Father's parental rights, finding, among other things, that termination of Father's parental rights was in the children's best interest.

*Best Interest Standard*

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b)). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).[8]

---

[7] In this instance, as in other cases we have reviewed, it appears that the trial court took into consideration facts which were not in evidence, although perhaps revealed at prior hearings. *See, e.g.*, *In re J.C.R.*, 2019 WL 2110109, at *2 n.2 (acknowledging the trial court held many hearings before the date of trial—none of which constituted evidence that can support a termination order—and urging the trial participants to spend more time developing the evidence at trial). "The only evidence that can support the trial court's order is that evidence admitted at trial." *In re E.F.*, 2019 WL 2194539, at *2 n.4.

[8] In determining whether the child's parent is willing and able to provide the child with a safe environment, we consider the factors set out in section 263.307(b) of the Family Code, which include:

In determining the best interest of a child, we apply the factors set forth in section 263.307(b) of the Family Code as well as the nonexclusive factors enumerated in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 371–72. The *Holley* factors are not all-encompassing, and a court need not find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d at 27.

---

(1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the [D]epartment; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

*Analysis*

Under the first *Holley* factor we consider the desires of the children. Nothing in the record directly indicates the children's desires.[9] T.N.J.J. was eight at the time of trial, D.J. was six, and B.B.M. was one. T.N.J.J. and D.J. were old enough to express their desires, but there is no evidence in the record as to their desires. Accordingly, the first factor does not support termination of Father's parental rights with respect to T.N.J.J. and D.J. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012) ("A lack of evidence does not constitute clear and convincing evidence."). B.B.M. was too young to express his desire. Builderback testified that B.B.M. was "extremely well cared for" by the foster parents and that his dry skin cleared up after he moved to the foster placement. "When a child is unable to express his desires, a fact finder may consider that he has bonded with the foster family, is well cared for by them, and has spent minimal time with the parent." *In re M.C.L.*, No. 04-17-00408-CV, 2017 WL 5759376, at *3 (Tex. App.—San Antonio Nov. 29, 2017, no pet.) (mem. op.). The first *Holley* factor weighs slightly in favor of termination with respect to B.B.M. under a legal and factual sufficiency review.

The second *Holley* factor concerns the children's current and future physical needs. Builderback testified that none of the children have special medical needs or behavioral problems. *Holley* factor two does not weigh in favor of termination. *Cf. In re E.N.C.*, 384 S.W.3d at 808 (explaining that *Holley* factor two did not weigh in favor of termination when the court of appeals stated that the children's emotional and physical needs were great "but did not explain or cite any evidence illuminating how those needs differ from other children or would go unmet if the children were with [the father]").

---

[9] Although not evidence that we may consider on review, the trial court remarked at the end of trial: "Reports throughout the case indicate a significant level of engagement—a significant level of attachment of the children to the father . . . ."

The remaining *Holley* factors, to a large extent, intertwine in this case. The third *Holley* factor concerns the emotional and physical danger to the children now and in the future. Other than drug use, which we discuss below, there is no evidence Father ever physically or emotionally abused the children or subjected them to any physical or emotional danger.

The fourth *Holley* factor concerns the parental abilities of the individuals seeking custody. Putting drug use aside, there is little in the record concerning the parental abilities of Father or the foster parents. The Department offered conflicting evidence from each caseworker. Batts testified that Father did not complete his parenting classes, but Builderback testified that he did. Both caseworkers testified that they had not observed visits between Father and the children, and neither knew if Father had visited the children at the first three placements. Batts testified that Father had not followed up with the recommendations made based on Father's psychological assessment, but Batts did not explain what additional psychological services were required of Father or how Father's failure to receive psychological services impacted his ability to parent. *Cf. In re K.N.J.*, No. 04-18-00826-CV, 2019 WL 2784765, at *9 (Tex. App.—San Antonio July 3, 2019, no. pet.) (holding evidence was legally insufficient to support parental termination where, among other things, the Department did not present any evidence to support its witnesses' opinions that the mother had not progressed sufficiently in her therapy by the time of trial to be protective of her children); *In re D.B.T.*, No. 04-14-00919-CV, 2015 WL 1939072, at *4 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.) (holding the trial court's best-interest finding was not supported by clear and convincing evidence where, among other things, "[t]he State presented no evidence about [the father's] parenting skills that would make his failure to complete a parenting course probative of [the child's] best interest"). Builderback testified that Father had not visited the children enough to demonstrate that he had learned from the parenting program. However,

Builderback did not know how often Father visited the children at the first three placements, where Father was allowed unsupervised visits, and she knew Father lacked transportation to visit the children at the foster placement. Additionally, the Department offered no evidence to suggest transportation was made available to Father but was refused. Without stronger support, her opinion is not probative evidence. *See In re K.M.J.*, No. 04-18-00727-CV, 2019 WL 1459565, at *7–8 (Tex. App.—San Antonio Apr. 3, 2019, pet. denied) (mem. op.) (holding testimony offered without any factual support was conclusory and not probative). Builderback did not describe the foster parents' parenting skills but asserted generally that the children were "extremely well cared for" at the foster placement. She also testified that T.N.J.J. could be a child, rather than a caretaker to the younger siblings; that D.J. was happy; and that B.B.M.'s dry skin cleared up after his move to the foster placement. However, because Builderback never observed the children with Father, she could not attribute the change to anything other than the children's removal from their prior placements.

The sixth *Holley* factor concerns the plans held by the individuals seeking custody and the seventh *Holley* factor concerns the stability of the proposed placements. Batts and Builderback testified that they did not know where Father was currently living, and Father had not provided proof of employment. Father testified that he had a full-time job and intended to rent an apartment on the Monday following trial. The trial court was free to disbelieve Father's testimony that he had a job and could secure an apartment. *See In re J.B.P.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (recognizing that the appellate court defers to the factfinder on witness credibility issues). The trial court, however, could not credit Builderback's testimony that the children's current foster placement could lead to permanency because she provided no details to justify this claim. *See In re E.N.C.*, 384 S.W.3d at 810 (explaining that conjecture is insufficient to meet the clear and

convincing evidentiary standard in parental termination cases); *In re K.M.J.*, 2019 WL 1459565, at *7–8; *In re D.M.*, No. 04-14-00858-CV, 2015 WL 3398379, at *5 (Tex. App.—San Antonio May 27, 2015, no pet.) (mem. op.) (explaining that caseworker's testimony that children have the "possibility" of being adopted was unsubstantiated and did not support a finding that termination was in the children's best interest). Builderback did not describe the stability of the foster home, the foster parents' employment, or their living situation, and she did not testify regarding the foster parents' ability to meet the children's needs in the future. *See In re R.M.*, No. 04-19-00218-CV, 2019 WL 3642647, at *6 (Tex. App.—San Antonio Aug. 7, 2019, no pet. h.) (mem. op.) (concluding evidence was legally and factually insufficient to support parental termination where, among other things, there was no evidence in the record regarding a foster family's ability to meet a child's needs in the future).

A parent's drug use, however, may indicate instability of the home because it exposes children to the possibility that a parent may be impaired or imprisoned. *See In re A.H.L.*, No. 01-16-00784-CV, 2017 WL 1149222, at *5 (Tex. App.—Houston [1st Dist.] Mar. 28, 2017, pet. denied) (mem. op.). Drug use also tends to suggest inadequate parenting skills. *See In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *7 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.). Moreover, drug use supports a finding that a parent engages in conduct that endangers the physical and emotional well-being of his children. *See In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *8 (Tex. App.—San Antonio Aug. 21, 2019, no pet. h.) (mem. op.). Batts testified that B.B.M. was born positive for amphetamines and marijuana and that the mother was a primary caregiver to the children prior to B.B.M.'s birth. Father denied the mother was a caregiver and denied a relationship with the mother any time after 2012. According to Batts, Father admitted to drug use and tested positive on a drug test eight months before trial, but there

was no evidence as to what drug was identified. At trial, Father admitted to smoking marijuana in the past, but denied a drug addiction.

*Holley* factor eight concerns the acts or omissions of the parent that may indicate an improper parent-child relationship, and *Holley* factor nine concerns any excuses for those acts or omissions. Both Batts and Builderback testified that Father failed to appear for at least four drug tests during the course of the case. Builderback also testified that, following Father's drug assessment, Father had been recommended drug treatment, that he knew about the recommendation, and that he never engaged in treatment. Father's family service plan required him to comply with all drug-assessment recommendations. Father testified that he attended three Narcotics Anonymous and Alcoholics Anonymous classes and believed his attendance was voluntary. He explained that he failed to attend drug tests because two tests conflicted with his parenting classes, and another test was set for a day the clinic was closed. According to Father, the last test conflicted with his work schedule, and he attempted to reschedule the test for non-business hours but to no avail. Builderback testified that Father told her he did not attend the last test because he lacked an identification card.

The Department's burden was to prove not simply that Father should not have custody of his children; its heightened burden was to prove, by clear and convincing evidence, that it is not in the children's best interest for them to have any legal relationship with him whatsoever. *See In re K.N.J.*, 2019 WL 2784765, at *11 (citing *In re J.A.J.*, 243 S.W.3d 611, 614–17 (Tex. 2007)). Unlike for a conservatorship appointment, the quantum of proof required to support a termination decision is clear and convincing evidence. *In re J.A.J.*, 243 S.W.3d at 616. While children who are ready for permanent placement in a safe and stable home should ordinarily not have to wait for a parent to turn his life around, here, there is no competent evidence that permanent placement is

anything more than a possibility at this point. *See In re K.N.J.*, 2019 WL 2784765, at *11. Builderback only speculated that the children's foster placement "could lead to permanency."

Putting the parents' drug use aside, the *Holley* factors weigh only slightly in favor of termination. *Holley* factor one only marginally weighs in favor of terminating Father's parental rights to B.B.M. *Holley* factors six and seven, which concern placement and stability, moderately support the trial court's best-interest finding because the evidence viewed in the light most favorable to the finding suggest that Father has not made stable plans for his children and the children are in a placement that is currently stable. However, the evidence is largely silent as to the other factors.

We must also consider Father's drug use and the mother's drug use to the extent that it reflects upon Father. Drug use can destabilize the home and expose the children to physical and emotional harm if not resolved. *See In re A.H.L.*, 2017 WL 1149222, at *5; *In re K.J.G.*, 2019 WL 3937278, at *8. Viewing the evidence in the light most favorable to the trial court's best-interest finding, I agree with the majority that a reasonable trier of fact could have formed a firm belief or conviction that termination of Father's parental rights was in the children's best interest; therefore, the evidence is legally sufficient to support the trial court's best-interest finding. *See In re J.F.C.*, 96 S.W.3d at 266. However, after considering all the evidence presented, including the disputed and contrary evidence, under the factual sufficiency standard, I cannot say the degree of proof rose to the level of clear and convincing as required to support the best-interest finding. *See* TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d at 266. According to Father's testimony, he understood drug treatment to be voluntary, and he attended three Narcotics Anonymous and Alcoholics Anonymous classes. Father testified that he attempted to locate a drug-testing facility that he could visit during off-hours. Additionally, Father denied ongoing involvement with the

mother.  Father completed parenting classes and testified that he obtained a job.  There is no evidence that Father used drugs in front of his children and there is little evidence as to the severity of his drug use.  The record reflects that Father admitted to marijuana use, and Batts testified that Father tested positive on a drug test eight months before trial but did not specify the drug involved.  Father's testimony suggests Father was willing to seek, accept, and complete drug testing and treatment but did not comprehend fully the treatment required, how to obtain testing and treatment, and the consequences of incompletion.  While we do not ignore Father's drug use, I cannot agree to affirm termination under a factual sufficiency review based on the limited evidence of Father's drug use and incomplete drug treatment where there is also evidence of partial completion and explanations for incompletion.  *See In re D.D.M.*, 2019 WL 2939259, at *7–8 (holding evidence was factually insufficient to support termination of a father's parental rights where the majority of the *Holley* factors substantially weighed against termination, even though evidence established the father's heavy methamphetamine use as well as marijuana, cocaine, and ecstasy use); *see also In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam) (holding court of appeals erred in reversing termination on factual sufficiency grounds by focusing on one pertinent factor "[r]ather than weighing all of the evidence").  Therefore, considering the entire record, including the paucity of the evidence as to most of the *Holley* factors and Father's testimony explaining his actions and omissions as well as his efforts to reunite with his children, I would conclude the evidence is factually insufficient to produce "a firm belief or conviction" that termination of Father's parental rights is in the children's best interest.  TEX. FAM. CODE ANN. § 101.007; *see In re J.F.C.*, 96 S.W.3d at 266–67.  Thus, I would reverse the trial court's order insofar as it terminates Father's parental rights. For completeness, I will also address the remaining issue of conservatorship.

## CONSERVATORSHIP

In his brief, Father sought reversal of the trial court's termination order and requested that we name him a conservator of the children; however, on appeal, he did not separately challenge the trial court's appointment of the Department as the children's managing conservator. The Department argues that its appointment as managing conservator was not subsumed within Father's challenge to the termination decision.

Texas Family Code section 161.207(a) provides a mechanism for the trial court to appoint the Department as the managing conservator if the court terminates the parent-child relationship with respect to both parents. TEX. FAM. CODE ANN. § 161.207(a). When the order of termination is reversed, section 161.207(a) will not support the Department's conservatorship. *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam). If the Department is appointed managing conservator solely as a consequence of the trial court's termination order, then a parent's challenge to the Department's conservatorship appointment is automatically subsumed within the parent's appeal of the termination order, and a separate issue on appeal challenging the Department's conservatorship is not required. *In re R.S.D.*, 446 S.W.3d 816, 822 n.5 (Tex. App.—San Antonio 2014, no pet.). However, if the Department has pled alternative grounds for conservatorship, and the trial court has entered findings supporting appointment under those alternative grounds, then the parent appealing the termination order must separately challenge the Department's appointment under the alternative grounds. *See In re J.A.J.*, 243 S.W.3d at 615; *In re R.S.D.*, 446 S.W.3d at 822 n.5.

Here, the Department pled alternative grounds for its appointment as the children's managing conservator. In its petition, the Department requested that it be appointed the children's sole managing conservator pursuant to sections 153.005 and 263.404 of the Texas Family Code.

Section 153.005 provides that in a suit affecting the parent-child relationship, "the court may appoint a sole managing conservator or may appoint joint managing conservators" and specifies the persons who may be managing conservators. TEX. FAM. CODE ANN. § 153.005.

> Section 263.404 of the Family Code allows the court to render a final order appointing the Department as the child's conservator without terminating parental rights if the court finds that (1) a parent's appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development, and (2) appointment of a relative of the child or another person would not be in the child's best interest.

*In re J.A.J.*, 243 S.W.3d at 614 (citing TEX. FAM. CODE ANN. § 263.404(a)). The Department's petition also alleges: "Pursuant to § 153.131, Texas Family Code, the appointment of a parent as permanent managing conservator of the children is not in the children's best interest, because the appointment would significantly impair the children's physical health or emotional development." This allegation tracks Texas Family Code section 151.131(a), which provides:

> Subject to the prohibition in Section 153.004,[10] unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

TEX. FAM. CODE ANN. § 151.131(a). Section 263.404 applies only when the trial court does not order termination of the parent-child relationship. *See In re J.A.J.*, 243 S.W.3d at 614–15; *In re A.L.M.*, 300 S.W.3d 914, 931 (Tex. App.—Texarkana 2009, no pet.). However, sections 153.005 and 153.131 could provide alternative grounds for the Department's appointment as conservator independent of the trial court's termination decision. *In re J.A.J.*, 243 S.W.3d at 615.

The trial court ordered that the Department be appointed sole managing conservator of the children in its termination order and stated as to each child: "[T]he Court finds this appointment

---

[10] Section 153.004 prohibits a trial court from making certain conservatorship appointments when there is evidence of domestic violence or sexual abuse. *See* TEX. FAM. CODE ANN. § 153.004.

to be in the best interest of the child." The trial court, however, made no additional findings related to conservatorship.

I would determine that the Department's appointment as sole managing conservator was solely the consequence of the trial court's termination decision pursuant to section 161.207 because the trial court made no finding pursuant to section 153.131 that "appointment of the parent or parents would not be in the best interest of the child[ren] because the appointment would significantly impair the child[ren]'s physical health or emotional development[.]" *See* TEX. FAM. CODE ANN. § 151.131(a). Therefore, Father's challenge to the conservatorship appointment was subsumed in his appeal of the termination order. *See In re D.N.C.*, 252 S.W.3d at 319 (holding a mother's challenge to a conservatorship appointment was subsumed in her appeal of a termination order because the trial court made no findings under section 153.131 and the only available statutory mechanism for the Department's appointment was as a consequence of termination pursuant to section 161.207); *In re A.S.*, 261 S.W.3d 76, 90–91 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding challenge to conservatorship was subsumed in an appeal of a termination order because the trial court made no findings under section 153.131, even though the Department plead alternative grounds for conservatorship under sections 153.005 and 153.131); *cf. In re I.G.*, No. 13-18-00114-CV, 2018 WL 3062581, at *5 (Tex. App.—Corpus Christi June 21, 2018, no pet.) (mem. op.) (holding challenge to conservatorship was not subsumed in an appeal of a termination order where the trial court made findings pursuant to the Department's alternatively pled grounds for conservatorship under sections 153.002, 153.005, and 153.131). Accordingly, I would further reverse the trial court's order as to conservatorship, and remand for further proceedings. *See Colbert v. Dep't of Family & Protective Servs.*, 227 S.W.3d 799, 815–16 (Tex. App.—Houston [1st Dist.] 2006) (reversing trial court order terminating a mother's

parental rights based on the factual insufficiency of the evidence and remanding for further proceedings), *pet. denied, In re D.N.C.*, 252 S.W.3d 317 (Tex. 2008) (per curiam).

Rebeca C. Martinez, Justice